755 A.2d 1176 (2000)
333 N.J. Super. 370
BOARD OF EDUCATION OF the BOROUGH OF ENGLEWOOD CLIFFS, BERGEN COUNTY, Petitioner-Respondent,
v.
BOARD OF EDUCATION OF the CITY OF ENGLEWOOD, New Jersey, Respondent-Appellant,
v.
Board of Education of the Borough of Tenafly, Bergen County, Respondent/Respondent.
In re Resolution to Accept the Final Report of the Committee on Englewood.
Superior Court of New Jersey, Appellate Division.
Argued May 9, 2000.
Decided July 20, 2000.
*1177 Arnold K. Mytelka, Springfield, argued the cause for appellant (Kraemer, Burns, Mytelka, Lovell & Kulka, Paul. L. Tractenberg and DeCotiis, Fitzpatrick & Gluck, attorneys; Mr. Mytelka, Mr. Tractenberg and Agnes I. Rymer, on the brief).
James S. Rothschild, Jr., Morristown, argued the cause for respondent Board of Education of the Borough of Tenafly (Riker, Danzig, Scherer, Hyland & Perretti, attorneys; Mr. Rothschild, on the brief).
John K. Worthington, Deputy Attorney General, argued the cause for respondent State Board of Education (John J. Farmer, Jr., Attorney General, attorney; Nancy Kaplen and Mary C. Jacobson, Assistant Attorneys General, of counsel; Mr. Worthington, on the brief).
Bernard K. Freamon, Newark, for amici curiae National Association for the Advancement of Colored People, New Jersey State Conference of the NAACP and Bergen County Chapter of the NAACP.
Before Judges SKILLMAN, D'ANNUNZIO and NEWMAN.
The opinion of the court was delivered by SKILLMAN, P.J.A.D.
This case was commenced in 1985 when the Board of Education of the Borough of Englewood Cliffs (Englewood Cliffs) filed a petition with the Commissioner of Education (Commissioner) seeking to sever its long-standing sending-receiving relationship with the Board of Education of the City of Englewood (Englewood), under which high school students residing in Englewood Cliffs are educated at Dwight Morrow High School (Dwight Morrow) in Englewood. Englewood opposed the petition and filed a cross petition seeking to enjoin the Board of Education of the Borough of Tenafly (Tenafly) from admitting tuition-paying high school students from Englewood Cliffs and Englewood. In addition, Englewood asked the Commissioner to require the three districts to form a single regional district at the high school level.
*1178 The petitions were referred to the Office of Administrative Law, and an Administrative Law Judge (ALJ) conducted a ninety-nine day hearing. The ALJ recommended the denial of Englewood Cliffs' petition to sever the sending-receiving relationship with Englewood. The ALJ also recommended granting Englewood's cross-petition to enjoin Tenafly from admitting students from Englewood Cliffs and Englewood on a tuition basis. In addition, the ALJ recommended the denial of Englewood's petition to compel Englewood Cliffs and Tenafly to join with Englewood in forming a regional high school district.
The Commissioner accepted the ALJ's factual findings and recommendations. The State Board of Education (State Board) affirmed the Commissioner's decision, but made several modifications. Although it agreed with the Commissioner's denial of Englewood's petition for the establishment of a regional high school district, it directed Englewood Cliffs and Englewood to develop a plan to encourage students residing in their communities to attend Dwight Morrow. The State Board also ordered the Commissioner to monitor implementation of the plan and present an annual report regarding the impact of the plan upon the racial composition of Dwight Morrow. In addition, the State Board enjoined not only Tenafly but also all other school districts in the State from admitting students residing in Englewood and Englewood Cliffs on a tuition basis.
Englewood Cliffs filed an appeal to this court from the State Board's denial of its petition to sever the sending-receiving relationship with Englewood, and Englewood filed a cross appeal from the State Board's refusal to order the establishment of a regional high school district.
During the pendency of the appeal, as the number of students from Englewood Cliffs attending Dwight Morrow continued to decline, the State Board adopted the Commissioner's recommendation that a study be undertaken to explore the potential for establishing a regional school district. Englewood Cliffs and Tenafly appealed from the State Board's resolution approving this recommendation.
We affirmed the State Board's denial of Englewood Cliff's petition to withdraw from the sending-receiving relationship with Englewood. Board of Educ. of Englewood Cliffs v. Board of Educ. of Englewood, 257 N.J.Super. 413, 457, 608 A.2d 914 (App.Div.1992). We also affirmed the State Board's orders enjoining any other school district from admitting students from Englewood and Englewood Cliffs on a tuition basis and authorizing a regionalization study. Id. at 474, 608 A.2d 914. In addition, our opinion stated in dictum that the State Board had the authority to order regionalization in this case:
The expansive general principle enunciated in Jenkins [v. Township of Morris Sch. Dist., 58 N.J. 483, 279 A.2d 619 (1971) ] was that cross-district regionalization is an available arrow in the Commissioner's desegregation quiver....
We think the correct interpretation is that cross-district regionalization is available even where a single community does not exist. The facts in Jenkins were happenstance which made the ultimate outcome of that case obvious but did not constitute a requirement for the application of the fundamental case doctrine.

[Id. at 476-77, 608 A.2d 914.]
On appeal, the Supreme Court of New Jersey affirmed substantially for the reasons expressed in our opinion. 132 N.J. 327, 625 A.2d 483 (1993). However, the Court expressly stated that it was not deciding whether the State Board or a court could mandate regionalization:
In reaching that conclusion [about the State Board's having authority to direct a regionalization study] we find it unnecessary to consider whether the State Board of Education has the authority to require regionalization in this case or whether a court may require regionalization as a judicial remedy. We neither *1179 express nor imply any position or opinion on the regionalization issue itself, and specifically emphasize that our affirmance of the authority of the State Board of Education to undertake such a regionalization study must not be taken to express or imply any view of the Court on the administrative or judicial power to require inter-district regionalization.

[Id. at 329, 625 A.2d 483.]
The Supreme Court of the United States denied Englewood Cliffs' petition for a writ of certiorari. 510 U.S. 991, 114 S.Ct. 547, 126 L.Ed.2d 449 (1993).
In January 1994, a new administration took office and a new Commissioner of Education was appointed shortly thereafter. The new Commissioner decided to hire an outside consultant to conduct a regionalization study rather than to complete the in-house study that had been started at the direction of his predecessor. The new Commissioner also decided to hire an outside consultant to review efforts to develop a voluntary, cooperative solution for the racial imbalance problems at Dwight Morrow.
In December 1994, the Department of Education contracted with Applied Data Services to conduct a regionalization study encompassing twenty communities in eastern Bergen County, including Englewood, Englewood Cliffs and Tenafly, and also contracted with Dr. Harry Galinsky, a retired superintendent of schools and the former president of the New Jersey Association of School Administrators, to assist those communities in developing a cooperative plan to encourage voluntary attendance at Dwight Morrow.
Both consultants submitted reports in July 1995. The Applied Data Services' report contained a number of alternative options for the establishment of a regional school district. The Galinsky report recommended several alternative means of encouraging students from Englewood Cliffs and other districts to attend Dwight Morrow, including the establishment there of a regional magnet school.
In the fall of 1995, the Department conducted public hearings concerning the Applied Data Services and Galinsky reports. Strong opposition to mandatory regionalization was expressed at those hearings.
Thereafter, a task force comprised of superintendents and board members in eight Bergen County school districts was established to develop a locally supported plan to address the problem of racial imbalance at Dwight Morrow. The task force submitted a plan, entitled "Dwight Morrow High School: A University Partnership," which recommended a partnership between Dwight Morrow and one or two universities or colleges to create a magnet program that would provide opportunities for Dwight Morrow students to take college level courses for credit. However, the Englewood Board rejected the plan.
While the Department of Education was conducting regionalization studies and attempting to develop a voluntary, cooperative solution to the problems of racial imbalance at Dwight Morrow, Englewood made a series of motions to this court for an order mandating the regionalization of the Englewood, Englewood Cliffs and Tenafly school districts. All of the motions were denied.
On February 5, 1997, the Commissioner issued a report to the State Board concerning proposals for the mandatory establishment of a regional school district as well as other proposals to improve the racial balance at Dwight Morrow. The Commissioner concluded that the State Board should not order mandatory regionalization, but should instead encourage school districts in the area to devise a voluntary solution to the racial imbalance problem at Dwight Morrow by means such as the establishment of university-affiliated magnet schools. The Commissioner's report stated in part:
State-ordered reassignment of students has been shown to be counterproductive *1180 because of the resentment it creates among parents and students. Affected students suffer the loss of friends, inconvenience, extended travel time, loss of choice, loss of control over educational decisions, and perceived diminution of educational quality.... In the current matter, conduct of the regionalization study clearly has been divisive. More than 6,000 residents of the affected communities attended public hearings and more than 7,000 wrote letters, the vast majority expressing their strong opposition to forced regionalization.
To achieve the desired goal of encouraging attendance at Dwight Morrow, parents and students must be educated and persuaded to consider the school. Ordering them to attend against their wishes would very likely increase the number of students choosing to attend private schools or to move to a different community, thereby exacerbating the problem rather than solving it.
Indeed, if assigning students to particular public school districts were an effective means of discouraging their attendance at private schools, the present dispute might not exist. Many Englewood residents, as well as nearly all of Englewood Cliffs' parents, elect to send their children to private schools despite being assigned to the Englewood public school district. The 1990 census showed that 38.18 percent of Englewood City's school age population is white, while 47.50 percent is black. Yet, only 4 percent of the Englewood school enrollment is white while 67 percent is black. Therefore, it is clear that the majority of white students in Englewood, as well as Englewood Cliffs, are choosing to enroll in private schools in lieu of attending Dwight Morrow despite their being assigned by the State to the Englewood Public School District.
....
Based on the past history of this matter, I believe that involuntary regionalization almost certainly would not achieve the goal of improving the racial balance among students attending Dwight Morrow High School, but rather would be more likely to cause additional students to attend private schools or to move to new districts. Thus, the result would be additional segregation and an increased sense of inferiority on the part of students attending Dwight Morrow.
I further recommend that the Department of Education continue its efforts to improve the quality of education at Dwight Morrow High School through vigorous implementation of the provisions of the new funding law under regulations of the State Board of Education. In addition, I recommend that the Department continue to encourage the involved districts to reach a voluntary solution to the problem, through means such as the university magnet school around which considerable agreement already has emerged.
On November 5, 1997, the State Board issued a decision which accepted the Commissioner's conclusion that it "would be counterproductive to compel regionalization" and that the Department of Education should instead develop "a cooperative solution which would also contribute to educational improvement." The State Board observed that "[t]he magnet school concepts set forth in the University Partnership and Applied Data Services reports hold much promise[,]" and that "[t]he various configurations for regionalization included in the Applied Data Services study also offer additional possibilities." However, the State Board refused to compel the establishment of a regional high school district. Instead, the State Board resolved "to exercise [its] supervisory powers and work collaboratively with the Commissioner" to devise a solution to the problem of racial imbalance at Dwight Morrow. Englewood filed a notice of appeal from this decision.
On September 2, 1998, the State Board's Committee on Englewood which had been *1181 established to effectuate the Board's November 5, 1997, decision, issued its final report. The Committee recommended that the State Board reaffirm its prior decision not to compel the establishment of a regional school district but instead to pursue a voluntary solution to the problem of racial imbalance at Dwight Morrow:
As directed by the State Board, we considered all of the available options, including magnet schools, charter schools and regionalization. We also reviewed the educational research materials relating to the effects of racial integration, including the long-term effects of desegregation on student outcomes.
....
Given our objectives, we conclude that the approach that should be taken must be a voluntary one. We find that such [an] approach must also be directed at enhancing the quality of education available for all students involved. After reviewing the documents, it is clear that the situation we are confronting presents an opportunity to broaden and improve the quality of the education programming available at Dwight Morrow and to expand the career opportunities that will be available for all students who attend high school in Englewood. Equally important, the approach which we adopt must insure that the resulting racial balance will satisfy our State's policy.
As described in this report, we reviewed several proposals which could produce a voluntary plan that was consistent with our objectives. We are not, however, recommending implementation of any single one of these proposals. Rather, we propose that the Englewood School District draw from all of the sources and develop a plan for submission to the Commissioner which satisfies the criteria set forth in this report. Such plan must include benchmarks for measuring progress toward achieving a racial balance at Dwight Morrow that would be acceptable under the Appellate Division's decision.... We recommend that the Commissioner, following review and comment by the State Board, be responsible for approving the plan. We also recommend that the Commissioner be responsible for overseeing implementation of the plan and for insuring that it is properly administered.
On October 7, 1998, the State Board passed a resolution approving the recommendations contained in the Englewood Committee's report. The State Board's resolution placed "initial responsibility" upon Englewood to develop "an enhanced plan, which shall include a reexamination of its proposed `Englewood Achieves' program in conjunction with the other approaches included in the final report of the Committee on Englewood" and further provided that the plan "must reasonably be expected to reduce the percentage of minorities at Dwight Morrow High School over the next five years so as to ultimately achieve a balance in the composite student body at Dwight Morrow that would be acceptable under the Appellate Division's Englewood decision."
Englewood filed a notice of appeal from the State Board's October 7, 1998 decision. We subsequently consolidated Englewood's appeals from the State Board's November 5, 1997, and October 7, 1998 decisions. Tenafly did not cross-appeal.
On appeal, Englewood argues that the racial imbalance of students attending Dwight Morrow violates the New Jersey Constitution and that a regional high school must be established to correct that racial imbalance. We reject Englewood's arguments and affirm the State Board's November 5, 1997 and October 7, 1998 decisions.
Preliminarily, we note that the Supreme Court's opinion was the mandate that governed the proceedings on remand. See Rodriguez v. Cordasco, 279 N.J.Super. 396, 405, 652 A.2d 1250 (App.Div.), certif. denied, 142 N.J. 451, 663 A.2d 1358 (1995). Because the Supreme Court expressly declined *1182 to decide "whether the State Board of Education has the authority to require regionalization in this case or whether a court may require regionalization as a judicial remedy[,]" 132 N.J. at 329, 625 A.2d 483, the State Board's authority to compel regionalization must be viewed as an open question.
Nevertheless, the Commissioner and State Board assumed that they had the power to order the establishment of a regional district, and on remand they considered the question to be whether mandatory regionalization or another plan for reducing the racial imbalance at Dwight Morrow represented "the most productive course" to follow in attempting to solve the problem. We adopt the same approach. We assume, without deciding, that the State Board would have authority to mandate the establishment of a regional school district, and we proceed to consider whether the State Board erred in declining to order that remedy.
We note at the outset, as in our prior opinion, that a decision of the State Board, "[l]ike other administrative decisions,... is entitled to our deference," and that "an agency's factual determinations are presumptively correct and will not be upset absent a showing that they are arbitrary, capricious or unreasonable." Englewood Cliffs, supra, 257 N.J.Super. at 455-56, 608 A.2d 914. "Appellate courts must defer to an agency's expertise and superior knowledge of a particular field." Greenwood v. State Police Training Ctr., 127 N.J. 500, 513, 606 A.2d 336 (1992). An agency's decision "is accorded an even stronger presumption of validity where, as here, it has been given discretion to determine the specialized procedures for its tasks." Englewood Cliffs, supra, 257 N.J.Super. at 456, 608 A.2d 914; see also Van Dalen v. Washington Township, 120 N.J. 234, 244-45, 576 A.2d 819 (1990); Board of Educ. of Elizabeth v. City Council of Elizabeth, 55 N.J. 501, 507-08, 262 A.2d 881 (1970). Therefore, the question is whether the State Board's determination that it should pursue a voluntary plan involving the establishment of a university-affiliated magnet school and other specialty programs, rather than mandatory regionalization, to address the problem of racial imbalance at Dwight Morrow, was arbitrary, capricious or unreasonable.
The Commissioner's essential conclusion, which the State Board adopted, was that "involuntary regionalization almost certainly would not achieve the goal of improving the racial balance among students attending Dwight Morrow High School, but rather would be more likely to cause additional students to attend private schools or to move to new districts[,]" and that instead of mandatory regionalization, "the Department [should] continue to encourage the involved districts to reach a voluntary solution to the problem, through means such as the university magnet school around which considerable agreement already has emerged." In reaching this conclusion, the Commissioner relied primarily upon the regionalization study conducted by Applied Data Services and the report of the Eastern Bergen County Task Force, composed of representatives of most of the school districts in Bergen County, entitled "Dwight Morrow High School: A University Partnership."
Applied Data Services concluded, among other things, that the quality of education is the "greatest concern" of all interested parents, regardless of their race; that the willingness of communities in eastern Bergen County to address what is often perceived as the "Englewood problem" increases proportionally when the proposed solution is deemed voluntary; and that there is strong support for a "magnet type school" if the "themes" of the programs are responsive to "parental/ community concerns about the quality of education...."
The University Partnership Report recommended the establishment of a partnership between Dwight Morrow and one or more universities or colleges to create an innovative educational program open to all *1183 Bergen County students. Under this proposal, Dwight Morrow students would have the opportunity to take college level courses and earn college credits. In addition, the report recommended the establishment of "other high quality programs" at Dwight Morrow, such as an Academy for the Advancement of Science and Technology, an International Baccalaureate Program, and theme programs in technology, health and human services, fine and performing arts, banking and finance, law and commercial studies. The University Partnership Report concluded that the racial imbalance at Dwight Morrow could be reduced "by attracting diverse students from districts throughout Bergen County to an innovative program," and that overall "student achievement and performance" also would be enhanced by such a program.
The Englewood Committee's report, which the State Board adopted in its October 7, 1998 decision, relied upon three additional reports: (1) "Englewood Achieving," a proposal by Englewood Mayor Paul T. Fader; (2) "New Jersey Regional Career Academies: Reform of Vocational-Technical Education and Rebirth of the American High School"; and (3) "Englewood Achieves!" a proposal submitted by Englewood to the Federal Magnet School Assistance Program. The "Englewood Achieving" report recommended the establishment of a university partnership program, which would offer both advanced placement courses and courses for which college credits could be earned. This report also recommended the establishment of technical preparation programs in fields such as health, engineering, accounting, and business management. In addition, the report recommended the establishment of a high performance alternative school to address the needs of "disruptive" or "disaffected" students.
This record provides adequate support for the State Board's conclusion that mandatory regionalization should not be required and that other alternatives for reducing the racial imbalance at Dwight Morrow, including the establishment of magnet and other specialty schools, should be pursued instead. The reports relied upon by the State Board concluded that a community's willingness to assist in the development of a plan to address problems of racial imbalance depends to a substantial extent on whether participation is volunteered rather than coerced. For that reason, mandatory regionalization would be unlikely to substantially relieve the racial imbalance at Dwight Morrow, and it could cause serious harm to public educational programs in the district. On the other hand, the establishment of magnet and other specialty schools would provide a genuine opportunity to reduce the racial imbalance at Dwight Morrow and at the same time improve the quality of public education in the region. Therefore, the State Board's decision to address the problem of racial imbalance at Dwight Morrow by a voluntary plan involving the establishment of a university-affiliated magnet school and other specialty programs, rather than mandatory regionalization, was not arbitrary, capricious or unreasonable.
Several other arguments by Englewood require brief mention. Englewood presents a one-page argument under a point heading which reads: "Intentional Governmental Action Facilitated Racial Segregation Here and Can Be Remedied Pursuant to Federal Constitutional Law." However, there is no evidence in this record that Englewood Cliffs, Tenafly or any other governmental agency engaged in intentional discrimination. Although Tenafly admitted students residing in Englewood and Englewood Cliffs into its high school on a tuition basis, there is no evidence that the motive for this policy was racially discriminatory, rather than simply to generate additional revenues for the district. In any event, the State Board enjoined Tenafly from admitting students from Englewood or Englewood Cliffs in 1988. Consequently, even if there were a basis for finding that Tenafly's policy of admitting students *1184 from Englewood and Englewood Cliffs on a tuition basis was racially discriminatory, it was remedied twelve years ago.
Englewood also argues that the State Board failed to make adequate findings of fact regarding the feasibility of the sixteen regional configurations recommended by Applied Data Systems. However, the clear import of the Commissioner's finding that mandatory regionalization "would not achieve the goal of improving the racial imbalance" at Dwight Morrow was that none of the regional configuration plans was "feasible." Moreover, the Commissioner and State Board expressly found that a voluntary approach, which includes the establishment of magnet and specialty schools, would provide a better opportunity than mandatory regionalization for dealing with the racial imbalance problem at Dwight Morrow.
Finally, we emphasize that even though the State Board's final decision of October 7, 1998 places the initial responsibility to develop a plan to achieve racial balance and educational quality at Dwight Morrow upon Englewood, it also directs the Commissioner to "provide appropriate assistance to the Englewood School District in its development of the enhanced plan." Under this directive, the Commissioner bears a heavy responsibility to assist in the development and implementation of a workable plan for Dwight Morrow. "The Commissioner has been appropriately charged with high responsibilities in the educational field," Jenkins v. Township of Morris Sch. Dist., supra, 58 N.J. at 504, 279 A.2d 619, which he may not simply delegate to a local school board. See Abbott v. Burke, 136 N.J. 444, 455, 643 A.2d 575 (1994) ("The responsibility for substantive education is squarely and completely committed to the State; delegation of any part of the educational function to school districts does not dilute that State responsibility at all."); see also In re Grant of Charter Sch. Application of Englewood on the Palisades Charter Sch., 164 N.J. 316, 332, 753 A.2d 687 (2000) ("The obligation to supervise the provision of a thorough and efficient system of education in all public schools is omnipresent for the Commissioner."). Moreover, the State Board acknowledged in its November 5, 1997 decision that "it would be pointless to attempt to implement any approach without developing the funding sources to ensure that the resulting program would have sufficient fiscal support on an ongoing basis." Therefore, the "appropriate assistance" which the State Board has directed the Commissioner to provide to Englewood must include assistance in developing the "funding sources" required to establish magnet and other specialty schools.
Affirmed.