788 A.2d 729

BOARD OF EDUCATION OF THE BOROUGH OF ENGLEWOOD
CLIFFS, BERGEN COUNTY, PETITIONER, v. BOARD OF EDU-
CATION OF THE CITY OF ENGLEWOOD, NEW JERSEY, RE-
SPONDENT–APPELLANT, v. BOARD OF EDUCATION OF THE
BOROUGH OF TENAFLY, BERGEN COUNTY, RESPONDENT–
RESPONDENT.

IN RE RESOLUTION TO ACCEPT THE FINAL REPORT
OF THE COMMITTEE ON ENGLEWOOD.

Argued October 22, 2001—Decided January 24, 2002.

*Arnold K. Mytelka* argued the cause for appellant (*Kraemer, Burns, Mytelka, Lovell & Kulka* and *Paul L. Tractenberg* and

*Berkowitz, Lichtstein, Kuritsky, Giasullo & Gross*, attorneys; *Mr. Mytelka, Mr. Tractenberg* and *Agnes I. Rymer*, on the briefs).

*James S. Rothschild, Jr.*, argued the cause for respondent Board of Education of the Borough of Tenafly, Bergen County (*Riker, Danzig, Scherer, Hyland & Perretti*, attorneys).

*Nancy Kaplen*, Assistant Attorney General, argued the cause for respondent State Board of Education (*John J. Farmer, Jr.*, Attorney General of New Jersey, attorney; *Ms. Kaplen* and *Michelle Lyn Miller*, Deputy Attorney General, of counsel; *Ms. Miller* and *Thomas Russo*, Deputy Attorney General, on the briefs).

The opinion of the Court was delivered by

STEIN, J.

We granted the petition for certification of the Board of Education of the City of Englewood (Englewood) to consider and resolve "the appropriate allocation of specific responsibilities between the Commissioner of Education and the Englewood School District in relation to the development and implementation of a voluntary plan that is designed to achieve an appropriate racial balance and educational quality at Dwight Morrow High School by means of magnet and specialty schools." 166 *N.J.* 604, 605, 767 *A.*2d 483 (2000). Although events that have transpired subsequent to our grant of certification may, if they prove successful, render moot or diminish the significance of the question certified, we nevertheless elect to resolve it. In view of the protracted and contentious history of this litigation that began in 1985, a voluntary, amicable and successful resolution brought about by the parties clearly is preferable to a resolution dependent on our adjudication of this appeal.

I

A

Although the record and briefs material to this appeal are voluminous, the narrow issue certified is based on two decisions by

the State Board of Education (State Board), one on November 5, 1997 and the other on October 7, 1998, concerning the steps that should be taken to resolve the longstanding segregation of the student body at Englewood's Dwight Morrow High School (Dwight Morrow). In its November 7, 1997 decision the State Board adopted the Report of the Commissioner of Education (Commissioner) dated February 5, 1997, in which he recommended against regionalization of the Englewood, Englewood Cliffs, and Tenafly school districts as a means of improving the racial balance at Dwight Morrow. The State Board concluded that neither regionalization nor agency adjudication could resolve the segregation problem at Dwight Morrow. Although acknowledging that the protracted litigation involving the three districts had "not ameliorated the racial isolation of the students attending Englewood's public schools," the State Board expressed its intention to pursue a voluntary solution that focused on the development at Dwight Morrow of a magnet school, affiliated with a university, that was designed to attract students from neighboring districts in order to achieve enhanced racial diversification of Dwight Morrow.

In its October 7, 1998 decision, the State Board adopted the recommendation of its Committee on Englewood that the Englewood School District be charged with the initial responsibility for developing an enhanced plan to reduce racial segregation at Dwight Morrow. The Board stated that the new plan was to include a reexamination of a prior magnet school plan entitled "Englewood Achieves" that had been submitted for federal funding, together with other approaches noted in the Committee's report. The plan to be developed by Englewood "must reasonably be expected to reduce the percentage of minorities at Dwight Morrow [ ] over the next five years so as to ultimately achieve a balance in the composite student body." The State Board's decision required the Commissioner to "provide appropriate assistance to [Englewood] in its development of the enhanced plan," mandated that Englewood's plan include benchmarks that would allow the State Board to assess progress on a regular basis, and ordered Englewood to submit its enhanced plan to the Commis-

sioner within two months. In a published opinion, the Appellate Division upheld the State Board's November 5, 1997 and October 7, 1998 decisions. *Bd. of Educ. of Englewood Cliffs v. Bd. of Educ. of Englewood*, 333 *N.J.Super.* 370, 382–83, 755 *A.*2d 1176 (2000) (*Englewood III* ). On the question of the allocation of responsibility, the Appellate Division observed that although the State Board had imposed on Englewood the initial responsibility for developing a plan to achieve racial balance and educational quality, the Commissioner "bears a heavy responsibility to assist in the development and implementation of a workable plan for Dwight Morrow," and that responsibility "must include assistance in developing the 'funding sources' required to establish magnet and other specialty schools." *Id.* at 384, 755 *A.*2d 1176.

## B

In determining whether the State Board's allocation of responsibility for remedying racial segregation at Dwight Morrow is sustainable, we first must review the factual record and prior adjudications in order to establish a context for resolving that issue. The procedural history of the litigation from 1985 to 1993 is summarized by the Appellate Division in *Englewood III:*

> This case was commenced in 1985 when the Board of Education of the Borough of Englewood Cliffs (Englewood Cliffs) filed a petition with the Commissioner of Education (Commissioner) seeking to sever its long-standing sending-receiving relationship with the Board of Education of the City of Englewood (Englewood), under which high school students residing in Englewood Cliffs are educated at Dwight Morrow High School (Dwight Morrow) in Englewood. Englewood opposed the petition and filed a cross petition seeking to enjoin the Board of Education of the Borough of Tenafly (Tenafly) from admitting tuition-paying high school students from Englewood Cliffs and Englewood. In addition, Englewood asked the Commissioner to require the three districts to form a single regional district at the high school level.
>
> The petitions were referred to the Office of Administrative Law, and an Administrative Law Judge (ALJ) conducted a ninety-nine day hearing. The ALJ recommended the denial of Englewood Cliffs' petition to sever the sending-receiving relationship with Englewood. The ALJ also recommended granting Englewood's cross-petition to enjoin Tenafly from admitting students from Englewood Cliffs and Englewood on a tuition basis. In addition, the ALJ recommended

the denial of Englewood's petition to compel Englewood Cliffs and Tenafly to join with Englewood in forming a regional high school district.

The Commissioner accepted the ALJ's factual findings and recommendations. The State Board of Education (State Board) affirmed the Commissioner's decision, but made several modifications. Although it agreed with the Commissioner's denial of Englewood's petition for the establishment of a regional high school district, it directed Englewood Cliffs and Englewood to develop a plan to encourage students residing in their communities to attend Dwight Morrow. The State Board also ordered the Commissioner to monitor implementation of the plan and present an annual report regarding the impact of the plan upon the racial composition of Dwight Morrow. In addition, the State Board enjoined not only Tenafly but also all other school districts in the State from admitting students residing in Englewood and Englewood Cliffs on a tuition basis.

Englewood Cliffs filed an appeal to this court from the State Board's denial of its petition to sever the sending-receiving relationship with Englewood, and Englewood filed a cross-appeal from the State Board's refusal to order the establishment of a regional high school district.

During the pendency of the appeal, as the number of students from Englewood Cliffs attending Dwight Morrow continued to decline, the State Board adopted the Commissioner's recommendation that a study be undertaken to explore the potential for establishing a regional school district. Englewood Cliffs and Tenafly appealed from the State Board's resolution approving this recommendation.

We affirmed the State Board's denial of Englewood Cliff's petition to withdraw from the sending-receiving relationship with Englewood. We also affirmed the State Board's orders enjoining any other school district from admitting students from Englewood and Englewood Cliffs on a tuition basis and authorizing a regionalization study. In addition, our opinion stated in dictum that the State Board had the authority to order regionalization in this case[.]

On appeal, the Supreme Court of New Jersey affirmed substantially for the reasons expressed in our opinion. However, the Court expressly stated that it was not deciding whether the State Board or a court could mandate regionalization[.]

. . . .

The Supreme Court of the United States denied Englewood Cliffs' petition for a writ of certiorari. 510 *U.S.* 991, 114 *S.Ct.* 547, 126 *L.Ed.*2d 449 (1993).

[333 *N.J.Super.* at 373–75, 755 *A.*2d 1176 (citations omitted).]

Critical aspects of the evidentiary record were summarized by the Appellate Division in its original decision, *Board of Education of Englewood Cliffs v. Board of Education of Englewood*, 257 *N.J.Super.* 413, 608 *A.*2d 914 (1992) (*Englewood I*), that modified and affirmed the State Board's earlier disposition:

C. *The Relationship between the Districts*

In October 1965, Cliffs and Englewood executed a 10–year sending-receiving contract to begin in 1967. The agreement essentially obligated Cliffs to send its

public high school students to DMHS and required that Englewood maintain DMHS' accreditation and confer with Cliffs "on matters of mutual concern to the High School program." Cliffs was obligated to pay Englewood for the cost of educating its students.

Every year between 1970 and 1976 Cliffs sent approximately 60.0% of its graduating eighth graders, or approximately 60 to 70 students, to DMHS. The remaining Cliffs' eighth graders chose to attend private schools. During these years, the total number of Cliffs' students attending DMHS averaged approximately 245 per year. During the middle 1970s, however, Cliffs became dissatisfied with the sending-receiving relationship. In 1977, rather than renew the relationship and because applicable law made terminations of such relationships subject to the Commissioner's approval, Cliffs petitioned the Commissioner to sever the relationship so that it could explore the establishment of sending-receiving relationships with other districts. Englewood opposed the severance. Cliffs eventually withdrew its petition, apparently because it was unable to support its allegation that DMHS was not providing a good education.

. . . .

In the late 1970s, newspaper articles emphasizing the negative aspects of DMHS began to appear. These newspaper accounts contributed to the growing public perception that DMHS had serious problems and to the declining enrollment of Cliffs' students at DMHS. During this period, the question of severance became a political issue; at one point all of the candidates for Cliffs' school board were in favor of severance, and the slate most committed to severance ultimately prevailed in the 1985 election.

Between 1974 and 1982, Cliffs affirmatively encouraged its high school-aged students to attend DMHS. For example, during 1980–1981, "cottage parties" were held between Cliffs and Englewood, at which board members and teachers from DMHS were available to answer questions about the school; however, the program ceased after one year, and by 1982 Cliffs stopped encouraging its students to attend DMHS altogether.

Before 1982, THS was the receiving school for students from Alpine, a wealthy community on Tenafly's northeastern border. Around 1982, Tenafly's superintendent reported to Tenafly that, in an informal discussion with Dr. Harold France, Superintendent of Cliffs' schools from 1973 to 1986, Dr. France had said that it would be "most interesting" if and when Tenafly decided to admit non-resident students on a tuition basis, *i.e.*, admission based on individual tuition agreements with parents outside the district as opposed to a sending-receiving agreement with another district. In 1982–83, Tenafly instituted a program to admit non-resident students to its public schools, including THS, on a tuition basis. When the program was adopted by Tenafly, Cliffs began providing, upon request, written instructions to the parents of Cliffs' students as to how to apply to THS for admission on a tuition basis, although it did not provide such instructions for any other school.

By 1983–1984 Cliffs had amassed grievances against DMHS as follows: declining attendance of Cliffs' students at DMHS; the belief that DMHS was no longer an effective school; Englewood's plan to begin sending its eighth graders to DMHS,

thereby further alienating Cliffs' DMHS students (because they would be at DMHS one year less than Englewood's students); and Englewood's failure to have discussed with Cliffs, in advance, the policy of sending eighth graders to DMHS. In November 1985, Cliffs voted to enter into a sending-receiving relationship with Tenafly; Tenafly reciprocated. Until such time as Cliffs' sending-receiving relationship with Englewood was terminated, however, the THS policy was to accept Cliffs' and other municipalities' students on a tuition basis. The primary factors which THS considered under its private admission program were the academic, disciplinary and attendance records of the applicants. Tuition for 1987–1988 was approximately $5,480.

From the inception of the THS private tuition program through 1986, 59.3% of its private students came from Cliffs and 22.9% from Englewood. In 1986, 76 students came from Cliffs and 16 from Englewood.

D. *Racial Composition and Enrollment Trends at DMHS and THS*

In general, public school enrollment was down in all three districts and this trend seemed likely to continue. Since 1977, enrollment of Cliffs' students at DMHS dropped dramatically and at a much faster rate than the general decline in the school-aged population. Having averaged approximately 60.0% throughout most of the 1970s, the number of graduating Cliffs' eighth graders attending DMHS fell from a high of 69.0% in 1980–1981 to a low of 4.4% in 1987–1988, or 2.6% of the total DMHS enrollment. In 1982–1983, 1,128 students attended DMHS, of whom only 119 were from Cliffs. In that year the DMHS student body was 31.5% white, 55.5% black, 10.3% Hispanic and 2.7% Asian. In 1987–1988, 799 students made up the DMHS student body, of whom only 21 were from Cliffs. During that year, the racial composition of the DMHS student body had changed to 11.8% white, 66.2% black, 17.8% Hispanic and 3.9% Asian.

After Tenafly's non-resident private admission program began in 1982, the number of Cliffs' students attending THS rose annually while the number of Cliffs' students attending DMHS continued to drop. Table 1 sets forth the enrollment trend between 1982 and 1988:

## TABLE 1

| School Terms | Cliffs Students Attending DMHS | Cliffs Students Attending THS |
|---|---|---|
| 1982–1983 | 119 | 11 |
| 1983–1984 | 92 | 21 |
| 1984–1985 | 73 | 33 |
| 1985–1986 | 60 | 48 |
| 1986–1987 | 35 | 62 |
| 1987–1988 | 21 | 76 |

In addition, following the inception of Tenafly's tuition program, the number of non-resident tuition students from all districts attending THS increased. By 1985–1986, THS had 74 non-resident students, or roughly three times the number of non-resident students enrolled in any other high school district in the State. For

example, of the 43 high school districts accepting non-resident students, only 16 had more than five such students.

. . . .

Englewood's own students had, increasingly over the years, chosen to go to private schools rather than attend Englewood's public schools. Private school alternatives were readily available in the area, including more than 20 non-public secondary schools. According to Dr. France, the student migration away from public schools begins early (*i.e.*, sixth or seventh grade) as parents desire to reserve a place for their children in the upper grades of selective private schools.

E.  *Causes and Effects of the Migration from DMHS*

From the time Cliffs made known its intention to form a sending-receiving relationship with THS and terminate its sending-receiving relationship with Englewood, Englewood argued that the issue was not school quality but race. Englewood's experts, Drs. Michelle Fine and Jerry Jacobs, explained that many white parents perceive integrated schools as inferior, and that this perception is a motivating factor in white parents' decisions as to where to send their children to school. Tenafly's expert, Dr. Eugene Smoley, Jr., acknowledged that both the quality and the perceived quality of a school are what substantially motivate parents' selection. Englewood's experts stressed the educational importance of racial diversity in public schools.

A white Cliffs' resident, a 1986 graduate of DMHS, described her high school experience and related that as an eighth grader in Cliffs' upper school in 1982, she regularly heard her classmates using terms like "Dwight Nigger" and "Black Morrow" to refer to DMHS students. She also described the prevailing Cliffs' misconceptions about DMHS, including fears that female students would be attacked or raped, that students' property would be stolen, and that students would be exposed to rampant drug abuse and unsafe restrooms. On the contrary, she, along with many Cliffs and Englewood parents and students, believed that DMHS was a good, safe school which received wide support for its functions and sports activities from members of both communities.

. . . .

Much of the evidence indicated that if Cliffs' parents were prevented from sending their children to THS, they would not send them to DMHS. This was largely due to the common perception in Cliffs as to problems at DMHS and the resulting "social pressure" on Cliffs' students not to attend DMHS. On the other hand, there was some evidence that certain Cliffs' parents would still enroll their children at DMHS and keep them enrolled there if tuition relationships with THS were enjoined (*e.g.*, in 1988, 3 of 14 Cliffs' eighth graders planning to attend THS said they would attend DMHS if not allowed to go to THS. Out of 25 Cliffs' students who started DMHS in 1982, 23 graduated in 1986).

[257 *N.J.Super.* at 430–36, 608 *A.2d* 914.]

The Administrative Law Judge (ALJ), after a ninety-nine day evidentiary hearing, found that Tenafly's tuition policy "has the clear effect of enticing white and Asian students away from a

nearby public high school already experiencing racial imbalance, thereby contributing to a polarized situation." *Id.* at 442, 608 *A.*2d 914. He observed:

> [T]he Tenafly Board has a novel tuition policy enacted to alleviate the adverse effects of its own declining enrollment. As applied to THS, the policy has many characteristics of a private school placement, including selective entry requirements, higher academic standards and payment of tuition. On its face the policy may not be racially exclusive, but whites and Asians, as a group, are better able to afford the entry fee. In practice, the policy has attracted a disproportionately high number of students residing in the neighboring communities of Cliffs and Englewood. Its practical effect is to drain upper income white and Asian college-bound students from DMHS, subverting that school's efforts to promote racial balance and luring many of its most academically talented students. Existence of the Tenafly tuition policy also creates social pressures among Cliffs students not to attend DMHS, even though it is the assigned public high school for Cliffs residents.

> Factually it is immaterial to a determination of this case how many tuition students from Cliffs might decide to go to private or parochial schools after the Tenafly option is foreclosed. THS is not a private institution, regardless of how it has been conducting its affairs. While state education officials do not have the authority to prevent someone from attending a nonpublic school, they do have unchallenged constitutional and statutory responsibility for supervising the public education system. A pernicious practice in the public schools cannot be allowed to continue unchecked simply because otherwise some parents might decide to remove their children from the public school system. Fact-finding should deliberately avoid any inquiry into what choices parents might conceivably exercise if the state's strong policy against segregation in public schools is properly enforced. Otherwise, the process may be misinterpreted as tacit encouragement of flight from the public schools in order to circumvent the law. Thus, it is unhelpful—as well as unseemly—to engage in a numbers game regarding how many of the Cliffs or Englewood students now or prospectively at THS would otherwise go to DMHS. The key facts are that THS enrolls 76 Cliffs students and 16 Englewood students who, by all rights, belong at DMHS if they choose to attend public school. Tenafly's tuition policy seriously undermines the continuing ability of the Englewood district to provide equal educational opportunity to all its students.

> ... Tenafly has been fishing in troubled waters. Bluntly stated, the Tenafly Board has adopted a tuition policy which has the clear effect of enticing white and Asian students away from a nearby public high school already experiencing racial imbalance, thereby contributing to a polarized situation. To accomplish its own ends, the Tenafly Board has instituted selective admissions requirements, including what is tantamount to an income test since only those who can afford to pay are eligible for admission. In what could accurately be called "cream-skimming," the Tenafly tuition policy achieves its intended purpose by attracting more highly motivated and academically competent students from its neighboring school district, at the expense of educational quality at DMHS.

In order to condemn Tenafly's beggar-thy-neighbor policy, it is unnecessary to establish that its adoption was the efficient producing cause of the decline in the number of Cliffs students at DMHS. (On the contrary, the evidence here tends to show that the beginning of the decline predated Tenafly's adoption of its tuition policy, although the decline has since accelerated.) It is enough that the Tenafly Board has set in motion a policy which exploits another district's weaknesses for its own benefit, thereby aggravating a bad situation. By the same token, it is unnecessary to find that the Tenafly Board was motivated by improper racial considerations in order to put a halt to the mischief it has made.

[*Id.* at 441–42, 608 A.2d 914.]

The Commissioner adopted the ALJ's fact-finding and legal conclusions, and specifically agreed with the ALJ's determination that Tenafly's practice of accepting Englewood Cliffs students on a tuition basis should not be permitted to continue:

Although the policy is, on its face, not discriminatory and although it was not adopted for improper motives, this does not mean that it should be allowed to stand insofar as the Cliffs and Englewood Boards are concerned, for the record has made it abundantly clear that the effect of the policy has been exactly what the ALJ denounces, namely, to exacerbate racial imbalance at DMHS by skimming off and luring students who are eligible to attend DMHS. Thus, in that sense it is "repugnant" and a "beggar-thy-neighbor" policy as it affects DMHS.

[*Id.* at 445, 608 A.2d 914.]

The State Board affirmed and modified the Commissioner's ruling, and its reasoning was summarized by the Appellate Division in *Englewood I:*

The State Board concluded that there was a cause and effect to this trend. Although it found that Tenafly had not initiated the tuition program with a discriminatory intent, it opined that its powers were not limited to cases involving evil motives. Acknowledging that it had no affirmative obligation to redesign school districts in order to establish racial balance, the State Board reasoned that because Cliffs had effectively raised the issue, it must either address the question of reversing the trend or accept a role in perpetuating the accelerating racial imbalance by its failure to act. Under the circumstances, the State Board determined that it had a duty to institute measures designed to ensure that high schoolers from Cliffs and Englewood would attend DMHS, their assigned school, if they attended any public high school. In order to discharge that duty, it restrained Tenafly and all other public school districts from accepting Cliffs or Englewood high-schoolers even though no other public school districts had sought to participate in this case. At the same time, it directed Cliffs and Englewood to develop a plan to encourage parents of the two districts to send their children to DMHS. The State Board felt that these mildly intrusive remedies had at least the potential for efficacy.

[*Id.* at 449–50, 608 A.2d 914.]

In *Englewood I* the Appellate Division, in affirming the State Board's disposition, explicitly affirmed the findings of the ALJ, the Commissioner and the State Board that the increased segregation of Dwight Morrow was caused in part by Tenafly's tuition policy and Englewood Cliffs Board decisions, both of which had racial overtones and were inimical to the maintenance of a racially balanced student body at Dwight Morrow:

> Moreover, and notwithstanding that a particularized finding of intentional discrimination is not a prerequisite for state remedies for racial imbalance, . . . such findings are the leitmotif which runs throughout the decisions here. The Commissioner and the State Board clearly found that Cliffs' residents had engaged in white flight from DMHS, which flight was facilitated by the Tenafly Board's private tuition policy and by the Cliffs Board. As the Commissioner noted: "[n]o one could seriously believe that racial prejudice and circumvention of integration is not at play in this case." Likewise, the State Board concluded that to deny relief here would be to make the State a "passive participant" in private *discrimination.* No more specific findings are required. Under the circumstances, the State Board's action clearly passes strict scrutiny; it goes without saying that the lesser burdens are also met.

> [*Id.* at 472, 608 *A.*2d 914 (citation omitted).]

Based on those factual determinations, the Appellate Division sustained the State Board's injunction against Tenafly's continued acceptance of tuition students:

> Here, we have affirmed the State Board's determination that the Tenafly tuition policy had a serious negative impact on the racial balance at DMHS. As Tenafly's non-indigenous population increased, the situation at DMHS worsened. Tenafly not only "lured" and "enticed" Cliffs' students by its "beggar-thy-neighbor" policy, and in doing so syphoned off a disproportionate number of high achievers, but also attracted white and Asian Englewood students. Given those findings, the effectuation of the State's constitutional policy in favor of racial balance as a function of the quality of education not only authorized but compelled an injunction against Tenafly.

> [*Id.* at 474, 608 *A.*2d 914.]

As noted, this Court affirmed and modified the Appellate Division's earlier disposition. *Englwd. Cliffs v. Bd. of Ed. of Englwd.,* 132 *N.J.* 327, 625 *A.*2d 483 (1993) (*Englewood II*).

The history of the litigation between our 1993 decision and the State Board's 1997 and 1998 rulings is summarized by the Appellate Division in *Englewood III*:

In January 1994, a new administration took office and a new Commissioner of Education was appointed shortly thereafter. The new Commissioner decided to hire an outside consultant to conduct a regionalization study rather than to complete the in-house study that had been started at the direction of his predecessor. The new Commissioner also decided to hire an outside consultant to review efforts to develop a voluntary, cooperative solution for the racial imbalance problems at Dwight Morrow.

In December 1994, the Department of Education contracted with Applied Data Services to conduct a regionalization study encompassing twenty communities in eastern Bergen County, including Englewood, Englewood Cliffs and Tenafly, and also contracted with Dr. Harry Galinsky, a retired superintendent of schools and the former president of the New Jersey Association of School Administrators, to assist those communities in developing a cooperative plan to encourage voluntary attendance at Dwight Morrow.

Both consultants submitted reports in July 1995. The Applied Data Services' report contained a number of alternative options for the establishment of a regional school district. The Galinsky report recommended several alternative means of encouraging students from Englewood Cliffs and other districts to attend Dwight Morrow, including the establishment there of a regional magnet school.

In the fall of 1995, the Department conducted public hearings concerning the Applied Data Services and Galinsky reports. Strong opposition to mandatory regionalization was expressed at those hearings.

Thereafter, a task force comprised of superintendents and board members in eight Bergen County school districts was established to develop a locally supported plan to address the problem of racial imbalance at Dwight Morrow. The task force submitted a plan, entitled "Dwight Morrow High School: A University Partnership," which recommended a partnership between Dwight Morrow and one or two universities or colleges to create a magnet program that would provide opportunities for Dwight Morrow students to take college level courses for credit. However, the Englewood Board rejected the plan.

While the Department of Education was conducting regionalization studies and attempting to develop a voluntary, cooperative solution to the problems of racial imbalance at Dwight Morrow, Englewood made a series of motions to this court for an order mandating the regionalization of the Englewood, Englewood Cliffs and Tenafly school districts. All of the motions were denied.

On February 5, 1997, the Commissioner issued a report to the State Board concerning proposals for the mandatory establishment of a regional school district as well as other proposals to improve the racial balance at Dwight Morrow. The Commissioner concluded that the State Board should not order mandatory regionalization, but should instead encourage school districts in the area to devise a voluntary solution to the racial imbalance problem at Dwight Morrow by means such as the establishment of university-affiliated magnet schools. The Commissioner's report stated in part:

. . . .

Based on the past history of this matter, I believe that involuntary regionalization almost certainly would not achieve the goal of improving the racial balance

among students attending Dwight Morrow High School, but rather would be more likely to cause additional students to attend private schools or to move to new districts. Thus, the result would be additional segregation and an increased sense of inferiority on the part of students attending Dwight Morrow.

I further recommend that the Department of Education continue its efforts to improve the quality of education at Dwight Morrow High School through vigorous implementation of the provisions of the new funding law under regulations of the State Board of Education. In addition, I recommend that the Department continue to encourage the involved districts to reach a voluntary solution to the problem, through means such as the university magnet school around which considerable agreement already has emerged.

[333 *N.J.Super.* at 375–77, 755 *A*.2d 1176.]

## C

The remaining elements of the factual record concern the events that occurred subsequent to the State Board's decision of October 7, 1998.

Although the State Board's October 7, 1998 decision required that Englewood submit within two months an enhanced plan that "must reasonably be expected to reduce the percentage of minorities at Dwight Morrow over the next five years so as to ultimately achieve a balance in the composite student body," Englewood's response of December 30, 1998 acknowledged that Englewood had been unable to comply with the State Board's demand. The Englewood response stated in part:

Accompanying this Response is a revised magnet schools proposal for Dwight Morrow High School. The revised magnet schools proposal is not proffered as a plan that will desegregate Dwight Morrow. It will not achieve the level of desegregation that is required. Rather, the revised proposal is proffered as an educational enhancement plan for a Dwight Morrow High School that will remain racially imbalanced absent stronger measures (i.e., absent regionalization). The Englewood Board of Education and the Englewood community wish to implement this magnet proposal to enhance Dwight Morrow's program. The current program at Dwight Morrow is already a high quality program; magnet programs would raise that quality to a higher level of excellence.

Essentially, Englewood proposed to implement a modification of its earlier "Englewood Achieves" proposal, that modification consisting of three magnet school programs in Communications and Arts, Applied Sciences and Technology, and International Studies and Business, combined with an alternative program for students

not sufficiently advanced to enroll in one of the magnet school programs. Englewood forecast that based on the most optimistic projections there would be a twenty percent non-minority population in the magnet school programs and slightly better than a ten percent non-minority population in the composite student body.

Englewood stated that it had applied to Bergen County for a grant of $1,456,500 to fund program planning and infrastructure changes required by its proposal, but contemplated receiving no more than $1,000,000 from the County. It also required additional funding of $911,500 for a six-month planning phase and a one-year pilot program. That funding, together with the shortfall anticipated in connection with the funding request to the County, contemplated initial State funding of $1,368,000 through the first year pilot program.

The State asserts, through a certification by Thomas Henry, employed by the Department of Education (Department) as Director of the Office of School–to–Career and College Initiatives, that the Department considered Englewood's submission to be unresponsive because Englewood insisted that only a regionalization remedy could desegregate Dwight Morrow. Henry stated that the State Board then directed Department personnel to develop a more effective magnet school proposal. That effort commenced in May 1999, and resulted in December 1999 in a "Request for Proposal" (RFP) prepared by the Department's staff. That RFP proposed the conversion of Dwight Morrow into a "career institute" by creating four career academies over the ensuing four-year period, to be partially financed by $1,000,000 in federal grant funds from the Department and $1,000,000 from Bergen County. The County's share of the funding, however, was conditioned on Englewood's termination of this litigation, a condition to which Englewood refused to accede.

In February 2000, Englewood responded to the RFP, expressing the view that the career academies would not end racial segregation at Dwight Morrow and noting its preference that the academies be part of a comprehensive high school, and not simply

replace the existing educational program. That response caused the Department temporarily to withdraw the RFP.

In August 2000, the Commissioner informed Englewood that the Department was willing to accept Englewood's response to the Department's RFP as the basis for a two-year funding award from the Department consisting of federal grant funds. Englewood accepted that proposal and received $275,000 to assist in establishing a career academy emphasizing business and finance.

A certification from Englewood's Superintendent states that a pilot magnet program in International Studies and Business began in September 2000, and enrolled twenty-six students, none of whom were white or Asian. She stated that Englewood planned to begin two additional magnet programs in September 2001, one in Art and the other in Applied Sciences and Technology. She asserted that Englewood would require approximately $32,000,000 to implement and operate additional and broader magnet programs over a five-year period, but noted that the Department had committed to date only $550,000 in funding over two years. In response, the Department states that it had committed $1,000,000 in funding over four years and estimated that the operating cost over a five-year period would not exceed $2,000,000. Based on the record before us, Englewood and the Department apparently arrived at an impasse over the cost and availability of funding for the proposal to develop a combined career institute and comprehensive high school at Dwight Morrow.

Fortunately, subsequent events appear to have made that impasse irrelevant and redirected the parties' efforts toward a different plan for resolving segregation at Dwight Morrow. A July 26, 2001 letter from Dr. Henry to the Superintendents of Englewood and the Bergen County Technical Schools District suggested that they explore a partnership pursuant to which the Bergen County Technical School (Bergen Tech) would offer some of its academy programs at Dwight Morrow. That proposal was received enthusiastically by both Superintendents. Shortly thereafter, several members of the Englewood Board of Education

visited the campus of the Bergen County Technical Schools District and were favorably impressed with its facilities and programs. Subsequent meetings ensued involving the Commissioner, Departmental staff and representatives from Englewood and the Bergen County Technical Schools District, resulting in an agreement among those parties to pursue the possibility that commencing September 2002, Bergen Tech would offer some of its academy-type programs at Dwight Morrow to a sufficient number of students from high schools throughout Bergen County so as to significantly diminish the racial imbalance at Dwight Morrow. At oral argument counsel for Englewood and the State Board reaffirmed that this proposal was being carefully studied, and the Deputy Attorney General represented that the Department was prepared to provide the necessary funding for the preliminary planning and other initial steps required to implement the proposed partnership. The Court has been informed subsequent to oral argument that the Department has agreed to provide $385,000 to cover start-up costs for the program to be incurred between November 15, 2001 and August 31, 2002.

## II

Concerning the narrow legal issue before us-the appropriate allocation of responsibilities between the Commissioner and Englewood in developing and implementing a voluntary plan to achieve an appropriate racial balance and educational quality at Dwight Morrow-we are satisfied that the issue previously has been resolved in this litigation and that that resolution constitutes the law of the case and binds all parties.

In its 1990 decision in this litigation, affirming and modifying the Commissioner's disposition, the State Board repeatedly and expressly acknowledged that it had the "responsibility to exercise fully our jurisdictional authority with respect to the public school system so as to remedy this situation." *Id.* at 690, 755 *A.*2d 1176. That determination was affirmed by the Appellate Division, *Englewood I, supra,* 257 *N.J.Super.* 413, 608 *A.*2d 914, and by this

Court, *Englewood II, supra,* 132 *N.J.* 327, 625 *A.*2d 483 (1993). Accordingly, we regard the State Board's earlier determination as binding under the law of the case doctrine. See *Abbamont v. Piscataway Tp. Bd. of Educ.,* 163 *N.J.* 14, 14–15, 746 *A.*2d 997 (1999); *Feldman v. Lederle Laboratories,* 125 *N.J.* 117, 132, 592 *A.*2d 1176 (1991).

In its 1990 decision, the State Board forcefully and consistently acknowledged its ultimate responsibility to take action to correct the racial imbalance that had developed at Dwight Morrow. The Board noted:

> In sum, given the balance between racial and national origin groupings that would exist were we to permit termination of the sending-receiving relationship between Englewood and Englewood Cliffs and the negative educational implications thereof, we deny Englewood Cliffs' petition. Such a limited ruling, however, would do nothing to correct the imbalance that has developed at Dwight Morrow over the last five years. *We believe that we would be denying both our authority and responsibility for proper implementation of our State's educational policies were we to sanction this imbalance by failing to take such steps as are necessary to correct it.*
>
> . . . .
>
> In short, the record shows clearly the trend toward withdrawal from the Englewood school community by members of the white majority from both Englewood and Englewood Cliffs during the relevant period. As a result, the proportion of Dwight Morrow student population that was black or Hispanic rose from 65.8% in 1982–83 to 84% by 1987–88. Under these circumstances, we cannot give State sanction to the continued admittance of increasingly large numbers of white students from Englewood and Englewood Cliffs by a neighboring district to its public high school where the school pupil population is already 80.7% white and but 1.5% black or Hispanic.
>
> *Given the circumstances with which we have been presented, we have the responsibility to exercise fully our jurisdictional authority with respect to the public school system so as to remedy this situation.* We conclude that the first step in achieving the kind of balance which would effectuate our State's policy is for the State Board of Education to direct such measures as will ensure that high school age students from Englewood and Englewood Cliffs will attend Dwight Morrow, their assigned school, if they attend public school. We therefore conclude that it is necessary to limit the discretion of other public school districts, including Tenafly, to accept high school students who are residents of Englewood or Englewood Cliffs on a tuition basis or otherwise.
>
> . . . .
>
> We repeat that, as established by *Booker* and *Jenkins,* our State's policy against discrimination and segregation in the public schools is of such vigor and import as

to match its policy in favor of a thorough and efficient education. Accordingly, where a question involving the exercise of discretion by a district board is brought before this agency, the Commissioner and the State Board of Education have both the power and responsibility to limit the exercise of that discretion, and, *where reasonable and feasible, to direct such remedy as necessary to effectuate our State's policy.*

Furthermore, there is no question that the Commissioner and the State Board have the responsibility to counter trends toward withdrawal from the school community by members of the white majority. Consequently, we must have the accompanying power to limit the exercise of discretion by district boards to the extent necessary to counter such withdrawal.

. . . .

We recognize that, as established below, Tenafly did not act with discriminatory intent in adopting its tuition policy or in admitting nonresident students under that policy. We find nothing, however, under State or federal law that would limit the exercise of authority by this agency to situations where a district board has acted with discriminatory intent. *To the contrary, we believe that both the Commissioner and the State Board have an affirmative obligation to take such steps as are necessary to correct an imbalance brought before us where, as here, our failure to act would make us a passive participant to the perpetuation of that imbalance.*

[*Englewood Cliffs Bd. of Educ. v. Englewood Bd. of Educ.*, 12 *N.J.A.R.* 566, 689–92 (emphasis added) (citations omitted).]

Although presented to us as a sending-receiving case, this matter has raised questions of fundamental State policy and this agency's responsibilities thereunder. It has been twenty years since our State Supreme Court has had the occasion to confront such questions in the context of public education. Furthermore, as previously discussed, articulation of our State's constitutionally-derived policy has occurred almost exclusively in a single district setting. While much progress has been made in effectuating our State's policy in that particular setting, that policy has not found judicial, legislative or administrative expression in a multi-district context. By our decision, we would provide that expression.

*As set forth above, we have concluded that we have both the responsibility and the authority to direct such measures as are necessary to correct the situation that has been brought before us. Such measures, of course, must be reasonable, feasible, and workable.*

By precluding high school students from Englewood and Englewood Cliffs from withdrawing from their assigned high school while remaining within the public school system, we would forestall further deterioration in the balance among racial and national origin groupings represented in the public school population assigned to Dwight Morrow. By directing the Cliffs Board to fulfill its leadership responsibilities arising from both its legal relationship with Englewood and our State's educational policies, we would create the context necessary to reverse the trend that has developed in this case.

These directives flow from our recognition that we cannot stand idly by while another urban/suburban split with the attendant educational implications indicated herein is perpetuated. We also recognize that, ultimately, additional measures may

be necessary to correct this situation. However, we cannot and should not direct measures that are more intrusive than necessary to effectuate our State's policy.

Therefore, while we must fulfill our responsibility to assess the sufficiency of the relief afforded by virtue of our decision, we must consider with equal care whether it is necessary to direct additional remedial measures at this time.

. . . .

Consequently, we have focused the exercise of our authority toward ensuring that high school age students from Englewood and Englewood Cliffs will attend their designated school if they remain in the public school system. We recognize that it is impossible to predict with certainty the degree to which these measures will succeed in reversing the trend that has developed here. However, we can assess whether the remedy that would be afforded by virtue of our decision will be sufficient if successfully implemented.

Had a return of Englewood and Englewood Cliffs students attending Tenafly High School been successfully effectuated in 1987–88, the pupil population of Dwight Morrow would have been comprised of approximately 16% white, 62% black, 16% Hispanic and 6% Asian. While not equally balanced, such a student population is both multi-racial and multi-cultural. Given that there is no fixed balance between racial and national origin groupings that can be considered ideal for all communities, such balance, if achieved, might well afford all students who attend Dwight Morrow the educational advantages of a heterogeneous student population. In that it has not been shown that more intrusive measures than those we have directed are necessary at this juncture in order to vindicate our State's constitutionally derived policy, we conclude that it would be premature for this agency to pursue compulsory regionalization at this point.

However, notwithstanding this conclusion, *we recognize that it is our responsibility to ensure that the situation is in fact corrected.* We therefore direct, as specified in the order appended hereto, that the Commissioner monitor the composition of the pupil population at Dwight Morrow so as to assess the effectiveness of the measures we have directed and to formally report to us on a yearly basis for the next five years as to the progress being made.

[*Ibid.* at 694–97, 592 A.2d 1176 (emphasis added) (citations omitted).]

In view of the prior history of this litigation, and the State Board's express assumption of responsibility in its 1990 decision for taking appropriate action to remedy the racial imbalance at Dwight Morrow, we cannot avoid the conclusion that the allocation of responsibility between Englewood and the Commissioner, as set forth in the Board's October 7, 1998 disposition, is skewed. In that decision the State Board imposed on Englewood the initial responsibility for developing an enhanced plan to reduce racial segregation at Dwight Morrow that "must reasonably be expected to reduce the percentage of minorities at Dwight Morrow over the

next five years so as to ultimately achieve a balance in the composite student body." The Board ordered the Commissioner to "provide appropriate assistance to [Englewood] in its development of the enhanced plan." That allocation of responsibilities strongly implies that Englewood, rather than the Commissioner or the Board, is responsible for developing a plan to resolve Dwight Morrow's racial imbalance.

Perhaps that implication was unintentional. In any event, the October 7, 1998 allocation of duties was not faithful to the Board's 1990 determination that it had the ultimate responsibility to take action to redress the high level of segregation at Dwight Morrow. We would not be troubled by a Board decision that imposed on Englewood the duty of undertaking the development of an initial proposal for the Commissioner's and Board's consideration if that delegation clearly had acknowledged that the Commissioner and the Board retained the ultimate obligation for designing and directing implementation of corrective action. That acknowledgment was especially critical in view of Englewood's steadfast belief that only regionalization could successfully redress racial imbalance at Dwight Morrow, and that a magnet school program would not significantly alter the racial composition of the student body.

Accordingly, we modify the Appellate Division's judgment and hold that the State Board's October 7, 1998 disposition must be construed to acknowledge that, notwithstanding its literal language, the Commissioner and State Board retain the ultimate responsibility for developing and directing implementation of a plan to redress the racial imbalance at Dwight Morrow. Although the State Board's 1990 disposition states that the Tenafly Board "did not act with discriminatory intent in adopting its tuition policy or in admitting nonresident students under that policy," that decision clearly reflects an acknowledgment that the actions taken by the Tenafly and Englewood Cliffs Boards contributed significantly to the deterioration of the racial balance at Dwight Morrow. In our view, that causal connection provides ample justification for the State Board's clear and unequivocal assump-

tion of responsibility for taking appropriate action to remedy segregation at Dwight Morrow.

In fairness, we must acknowledge that the most recent actions taken by the Commissioner and the Department since October 7, 1998 appear to reflect an understanding of their obligations in this matter. Specifically, their initiative in proposing the partnership between Englewood and the Bergen County Technical Schools District and in providing funding for the start-up costs demonstrate their commitment to pursuing and achieving a successful resolution of this difficult issue. The amount of long-term funding required, including any necessary structural or remodeling costs, obviously will depend on the specific costs to be incurred, the amount of federal and other public and private grant money available, and the tuition revenues to be realized from the operation of the proposed academy partnership between Bergen Tech and Dwight Morrow.

Although no issue concerning funding of the proposed academy partnership is before the Court, we reiterate that in its 1990 decision the State Board acknowledged its "obligation to take such steps as are necessary to correct" the racial imbalance at Dwight Morrow. The State already has accepted responsibility to fund initial start-up costs in the amount of $385,000. Based on the representations made at oral argument, our assumption is that the proposed academy partnership is both feasible and affordable. On that assumption, we are confident that the parties will not permit so promising a resolution of Dwight Morrow's racial imbalance to fail because of disagreement over a fair allocation of funding responsibility.

As we expressed earlier in this opinion, an effective and consensual resolution of Dwight Morrow's racial imbalance not dependent on this Court's disposition, and resulting from the Department's and Englewood's joint efforts in combination with those of the Bergen County Technical Schools District, would constitute a constructive and positive outcome for this protracted, contentious and important litigation, and most importantly, provide an en-

hanced educational environment at Dwight Morrow in which all students who attend that school could pursue their educational goals and realize their educational potential.

### III

As modified, we affirm the judgment of the Appellate Division.

*For affirmance and concurrence*—Chief Justice PORITZ and Justices STEIN, COLEMAN, VERNIERO, LaVECCHIA, and ZAZZALI—6.

*Opposed*—None.

STEIN, J., concurring

I fully appreciate that no issue concerning funding of the proposed academy partnership is before the Court. For whatever assistance it may provide to the parties, however, my clear understanding of the State Board's 1990 decision is that it constitutes an acknowledgment that the State Board bears primary responsibility for providing or procuring financing for any plan designed to alleviate racial imbalance at Dwight Morrow.

LaVECCHIA, J., concurring.

I concur in the disposition of the Court. I write separately to register my objection to the majority's discussion of fiscal responsibility for the costs of implementing a plan to alleviate racial imbalance in Dwight Morrow. That issue is not before us and was not briefed by the parties. Resolution of the issue is obviously unnecessary to our decision. Moreover, on the merits, I do not regard the general statements in the State Board's 1990 decision concerning the Commissioner's and State Board's power and responsibility to direct such measures as are necessary to remedy segregation in the schools as pronouncements on responsibility for the cost of such remedial actions. With that limitation, I join in the judgment of the Court.