MAYFLOWER SECURITIES CO., INC., APPELLANT, v. BUREAU OF SECURITIES IN THE DIVISION OF CONSUMER AFFAIRS OF THE DEPARTMENT OF LAW AND PUBLIC SAFETY, RESPONDENT.

Argued October 24, 1973—Decided December 4, 1973.

*Mr. Joseph M. Jacobs* argued the cause for appellant (*Messrs. Jacobs and Coburn,* attorneys).

*Mr. Stephen Skillman,* First Assistant Attorney General, argued the cause for respondent (*Mr. George F. Kugler, Jr.,* Attorney General of New Jersey, attorney; *Mrs. Virginia Long Annich,* Deputy Assistant Attorney General, of counsel; *Mr. Thomas H. Sullivan,* Deputy Attorney General, on the brief).

The opinion of the Court was delivered by

HALL, J. This appeal derives from an order of the Bureau of Securities suspending for a period of 20 days the registration of appellant Mayflower Securities Co., Inc. (Mayflower) as a securities broker-dealer, and prohibiting its officers, agents and employees from effecting any securities transactions from or within New Jersey during that period. The order, which has been stayed pending appeal, was based on findings by the Chief of the Bureau, who sat as the hearing officer, that Mayflower had violated provisions of our securities law and rules by employing an unregistered agent, Alan Robert

Levine,[1] and by failing to possess certain customer transaction records required to be kept. The latter violation was discovered during the Bureau's investigation of the former. The order did not allocate the period of suspension as between the two violations. The Appellate Division affirmed in an unreported opinion, holding simply that there was ample credible evidence in the record to support the agency findings and conclusions. We granted certification on Mayflower's petition. 63 *N. J.* 558 (1973).

The interrelated questions before us are, in effect, whether the claimed violations meet the legal requisites permitting suspension of a registration under the statutory provisions authorizing this penalty and, even if they do, whether the penalty, under the circumstances, is so harsh as to be arbitrary and an abuse of discretion.

Since the pertinent statute and rule provisions have not previously been considered by this court, we should first outline our view of them.

The scheme of New Jersey's regulation of the securities business in the state is set forth in the Uniform Securities Law (1967), *N. J. S. A.* 49:3–47 *et seq.*, and in rules adopted by the Bureau of Securities pursuant thereto (see *N. J. S. A.* 49:3–67(a)), now found in *N. J. A. C.* 13:13–1.1, *et seq.* The law is generally modeled upon the Uniform Securities Act approved in 1956 by the National Conference of Commissioners on Uniform State Laws, 7 *Uniform Laws Annotated, Business and Financial Laws* (Master ed. 1970) 691, but. as we have previously noted, with differences in a number of respects. See *Data Access Systems, Inc. v. State of New Jersey, Bureau of Securities,* 63 *N. J.* 158, 162 (1973).

---

[1] When the proceeding was instituted by the Bureau, the agent was also a party, charged with engaging in New Jersey securities transactions while unregistered and ordered to cease and desist therefrom. The order against Mayflower vacated the restraint against Levine and imposed no penalty upon him. He was reregistered immediately and has not been a party to the action since.

Basic to the regulatory scheme, insofar as pertinent to the case, is the requirement of registration with the Bureau — in effect, licensure after meeting certain qualifications — of all broker-dealers and their agents (salesmen). An agent must be employed by a particular registered broker-dealer. *N. J. S. A.* 49:3–56(a) and (b). These subsections expressly declare it to be unlawful for any person to act as a broker-dealer or agent in this state unless he is so registered and for any broker-dealer to employ an agent unless the latter is registered. By statute, *N. J. S. A.* 49:3–56(d), and rule, *N. J. A. C.* 13:13–5.1, all registrations expire on December 31 of the year next ensuing the year in which the registration became effective and must be renewed prior to such date by the completion and submission of forms issued by the bureau and the payment of a fairly nominal fee. It is safe to say that renewal is *pro forma* unless the application therefor discloses or the Bureau otherwise knows of some change of circumstance which would demonstrate that the applicant no longer meets the required qualifications. See *N. J. A. C.* 13:13–5.1, 5.2, 5.3, 11.14 and 11.16.

A second pertinent requirement of the regulatory scheme is that all broker-dealers must keep, and preserve for three years, at their principal place of business, open to the inspection of the Bureau, all books and records required to be kept by the Securities and Exchange Commission. *N. J. S. A.* 49:3–59(b) and *N. J. A. C.* 13:13–1.9 The purpose is obviously to facilitate Bureau investigation and checking to make certain that all requirements of the law and rules relative to the operation of the business are complied with. See *N. J. S. A.* 49:3–68. It is not disputed here that customer transaction records are among those required to be maintained and available.

Three forms of sanctions are expressly prescribed by the law for violations of the statute or rules by a broker-dealer or agent, apparently to be selected from by the Bureau Chief in the reasonable exercise of his discretion depending on

the nature and circumstances of the violation and the offender. One, not involved here, is a regular criminal prosecution, for a misdemeanor, of one who "willfully" violates the law or rules. *N. J. S. A.* 49:3–70(a). This is derived from the Uniform Act, 7 *Uniform Laws Annotated, supra,* § 409(a), p. 768. Another is a monetary penalty, presumably administratively assessed by the Bureau, of not more than $200 for a first violation, not more than $500 for a second violation and $500 for subsequent violations. *N. J. S. A.* 49:3–70(b). It is to be noted that the availability of this sanction does not require a willful violation, although we would think it usable even if the violation were of such character. This sanction is not provided for in the Uniform Act and appears to be peculiar to New Jersey. The third form, that utilized here, is suspension or revocation of a registration. *N. J. S. A.* 49:3–58. This too is modeled after the provisions of the Uniform Act. 7 *Uniform Laws Annotated, supra,* § 204, pp. 710–713, and is substantially like section 15(b) of the federal Securities Exchange Act of 1934, 15 *U. S. C. A.* § 78o(b)(5). This procedure involves a full-scale hearing, if requested by the offender, and must be bottomed, as far as this case is concerned, on two fundamental findings: (1) that the order "is in the public interest" (*N. J. S. A.* 49:3–58(a)(1)), and (2) that the broker-dealer or agent complained against "has *willfully* violated or *willfully* failed to comply with any provision of this law or a predecessor law or any rule or order authorized by this law or a predecessor law" (*N. J. S. A.* 49:3–58(a)(2)(ii)). (Emphasis supplied). The "public interest" requirement does not come into play unless a willful violation is first found. These severe sanctions seem obviously designed for use in serious situations.

The "public interest" requirement seems to imply a conclusion that revocation or suspension of registration is felt necessary to protect present and future customers of the registrant, *i. e.,* the investing public — for example, revoca-

tion, if the registrant is shown to be unfit to continue to engage in the securities business, or suspension from business for a period, to impress upon him the necessity for drastically mending his ways lest he reach the level of unfitness. *Cf.* 69 *Am. Jur. 2d,* Securities Regulation — Federal, § 357. It is worthy of mention that the Commissioners' Note to the Uniform Act, in commenting upon this requirement, says: "But the requirement that such a finding be made in all cases emphasizes that not every minor or technical infraction is meant to result in a denial, suspension or revocation order." 7 *Uniform Laws Annotated, supra,* § 204, p. 715.

With respect to the meaning and intent of the "willful" requisite, the Commissioners' Note says this:

As the federal courts and the SEC have construed the term willfully in § 15(b) of the Securities Exchange Act of 1934, 15 U. S. C. § 78*o*(b), all that is required is proof that the person acted intentionally in the sense that he was aware of what he was doing. Proof of evil motive or intent to violate the law, or knowledge that the law was being violated is not required. The principal function of the word 'willfully' is thus to serve as a legislative hint of self-restraint to the Administrator. [7 *Uniform Laws Annotated, supra,* § 204, p. 715].[2]

This Note may well be too simplistically stated in light of the myriad of factual situations which may arise. We need not consider the problem beyond a few short comments. Certainly a deliberate omission to act should be considered to be willful just as an intentional act of commission is. Federal cases under section 15(b) of the Securities Exchange Act of 1934 find affirmative or negative conduct to be willful where there has been gross negligence or reckless conduct in disregard of plain duty in serious situations, such as fraudu-

---

[2]The Note under the criminal penalties section, 7 *Uniform Laws Annotated, supra,* § 409(a), p. 769 refers to this quoted comment to § 204 as indicative of the meaning of "willfully" in the criminal section. We need not consider this aspect here.

lent representations to customers or the public.[3] On the other hand, mere careless or inadvertent acts or failures to act resulting in insubstantial technical violations ought ordinarily not to warrant a conclusion of willfulness. See *e. g., In re Lowell Niebuhr & Co., Inc.,* 18 *S. E. C.* 471 (1945).

Curiously perhaps, neither our law and rules nor the Uniform Act expressly provide for the imposition of lesser sanctions, such as censure or reprimand,[4] where there is a violation which is not of a serious nature — for example, one not willful or not sufficiently affecting the public interest. We would suppose that the Bureau has implicit authority to impose such a lesser sanction, with or without the imposition also of a monetary penalty, in such cases, following informal hearing or conference, and would trust that, if such a procedure is not now followed, it will be instituted, accompanied by the adoption of an appropriate rule.

Finally, on the matter of the applicable law, the thoroughly established scope of judicial review of administrative adjudications should be briefly noted. As to state agency findings, the role of the appellate court is that of determining " 'whether the findings made could reasonably have been reached on sufficient credible evidence present in the record,'

---

[3]See *e. g., Quinn and Company v. Securities and Exchange Commission,* 452 *F. 2d* 943 (10th Cir. 1971), *cert. den.* 406 *U. S.* 957, 92 S. Ct. 2059, 32 *L. Ed. 2d* 344 (1972) ; *Stead v. Securities and Exchange Commission,* 444 *F. 2d* 713 (10th Cir. 1971), *cert. den.* 404 *U. S.* 1059, 92 S. Ct. 739, 30 *L. Ed. 2d* 746 (1972) ; *Hanly v. Securities and Exchange Commission,* 415 *F. 2d* 589 (2nd Cir. 1969) ; *Dlugash v. Securities and Exchange Commission,* 373 *F. 2d* 107 (2nd Cir. 1967) ; *United States v. Benjamin,* 328 *F. 2d* 854 (2nd Cir.), *cert. den.* 377 *U. S.* 953, 84 S. Ct. 1631, 12 *L. Ed. 2d* 497 (1964) ; *Barnett v. United States,* 319 *F. 2d* 340 (8th Cir. 1963).

[4]In the federal Securities Exchange Act of 1934, the section authorizing suspension or revocation of an over-the-counter broker or dealer for willful violations when required in the public interest also expressly empowers censure as a permissible sanction. 15 *U. S. C. A.* §78*o*(b)(5).

considering 'the proofs as a whole,' with due regard to the opportunity of the one who heard the witnesses to judge of their credibility * * * and * * * with due regard also to the agency's expertise where such expertise is a pertinent factor." *Close v. Kordulak Bros.*, 44 *N. J.* 589, 599 (1965). The appellate application of this standard requires far more than a perfunctory review; it calls for careful and principled consideration of the agency record and findings in the manner outlined in *State v. Johnson*, 42 *N. J.* 146, 161–162 (1964). An appellate tribunal is, however, in no way bound by the agency's interpretation of a statute or its determination of a strictly legal issue. As far as review of agency imposed sanctions is concerned, there is no doubt of a court's power of review under the tests of illegality, arbitrariness or abuse of discretion and of its power to impose a lesser or different penalty in appropriate cases. *West New York v. Bock*, 38 *N. J.* 500, 519–520 (1962); *Ishmal v. Division of Alcoholic Beverage Control*, 58 *N. J.* 347 (1971).[5] See generally *In re Senior Appeals Examiners*, 60 *N. J.* 356 (1972), and cases cited therein. Of course, we are not unmindful in the review of securities cases that the area is a sensitive one, open to great abuses and therefore subject to careful governmental regulation to assure that those who engage in the business meet high standards in the interest of protection of the public.

We turn to the factual aspects of the case before us and the application thereto of the legal principles we have set forth. We accept the undisputed representations of counsel that Mayflower is a sizeable broker-dealer in over-the-counter securities, handling over 100 issues and acting as a specialist or "market maker" in about 15 of them. It is based in New York City and has five branches in New Jersey, with 600 full and part-time agent-salesmen employed here serving accounts

---

[5] An intimation to the contrary in *Higgins v. New Jersey Bureau of Securities*, 100 *N. J. Super.* 266, 276 (App. Div. 1968), is incorrect.

of about 10,000 New Jersey customers. It is obvious that the 20 day suspension would put Mayflower and its 600 salesmen out of business in New Jersey for that period, would deprive its customers of their services, and might well result in the permanent loss of some customers. There is nothing in the record to indicate that Mayflower has been a persistent violator of our law and rules.

With respect to the agent registration violation charge, there is no doubt that Levine was not registered as an agent with the Bureau from January 1, 1969 to April 1972, that Mayflower employed him during that period and that he executed New Jersey security transactions throughout the period, resulting in a violation by Mayflower of *N. J. S. A.* 49:3–56 (b). Mayflower so concedes. It would have been well advised to have so stated on the record at the outset of the agency hearing, the thrust of its presentation being explanation and extenuation.

That explanation revolves around the Bureau's and Mayflower's practice of processing registration renewal applications of the latter's agents. These practices were loose at both ends. Although the statute appears to place responsibility for renewal upon the agent, the practice was for the Bureau to send renewal applications to Mayflower at its main office in New York for all agents whose registration expired at the end of the particular year and the latter undertook to secure the renewals. In fact, Levine testified that he personally did not know how long his registration was good or when it expired. For the year ending December 31, 1968, the Mayflower expirations totalled 200 to 250. Its main office employees sent to the particular New Jersey office the applications for agents working out of that office. In the case of Levine, who was associated with the Union branch, the branch manager gave him the application, which he completed and returned to the manager who told him he would send it to the main office. The main office procedure was, upon receipt of all the renewal applications, to forward them to the Bureau with a check to cover the fees and a receipt

for each, prepared by Mayflower, to be executed by the Bureau and returned to Mayflower for its files. (This receipt is the only indicator the employer has to evidence agent registration; the Bureau issues no license card or other document to the agent, which it might well do, since he possesses no proof that he is entitled to engage in New Jersey security transactions. We are informed that since the inception of this case, the Bureau follows up with the employer broker-dealer as to agent renewal applications not received by it.)

No one is certain what happened to Levine's application after he returned it to the branch manager following completion. The testimony was that it was not in the Bureau's files. (The matter came to light in May 1972 when Levine left Mayflower's employ to become associated with another broker and filed the required statement of that change with the Bureau, *N. J. S. A.* 49:3–56(b).) Whether the renewal application was mislaid in the branch office, mislaid in the main office or mislaid in the Bureau office cannot be determined. The fact that no renewal registration was effected was not caught by Mayflower apparently because an office employee misread, carelessly we think, an earlier receipt in Levine's file as covering the 1969 renewal.

It is clear that Levine was duly qualified for renewal covering the years 1969, 1970, 1971 and 1972. It is equally clear that he thought he was registered and did business accordingly and that Mayflower thought he was registered and employed him accordingly. We find no evidence of bad faith on the part of either. At worst, there was only careless processing and handling of the renewal application by Mayflower not amounting to gross negligence or reckless disregard. The violation must be called technical and not willful. While we fully appreciate the importance of agent qualification and registration in the regulatory scheme (see Note, Securities Regulation in New Jersey, 17 *Rutgers L. Rev.* 602, 607–608

(1963)), there was certainly no injury to the public interest in the *instant circumstances.*[6]

Moreover, the Bureau did not expressly find, as *N. J. S. A.* 49:3-58(a)(2)(ii) and (a)(1) positively require, that Mayflower willfully violated *N. J. S. A.* 49:3-56(b) and that suspension of its registration was in the public interest, nor can we infer such findings from what it did say. (The Bureau's failure in this regard also applies to the record-keeping violation charge.) Even if such findings had been made, we would have to conclude that they would not be supported or warranted by the record, and so would be improper, for the reasons stated.

Consequently, it has to follow that the sanction of suspension for any length of time for this registration violation is illegal and must be set aside. Since, as will shortly be indicated, remand to the Bureau is required as to the record-keeping violation charge, we think it desirable that the appropriate sanction should be imposed by the Bureau, after hearing, rather than by this court. Such a sanction could validly be a reprimand together with payment of the registration fees for the years involved plus, at the most, a monetary penalty under *N. J. S. A.* 49:3-70(b).

The record-keeping violation charge presents a somewhat more complicated and different situation. When Levine's notice of change of employment reached the Bureau in May

---

[6]Since Levine's registration was not renewed, according to the Bureau's files, for the two year period commencing January 1, 1969, the Bureau did not send Mayflower a renewal application for the two year period commencing January 1, 1971. This resulted in Levine not being registered for this second two year period as well, which could be said to amount to a second violation. As we have said, the practice was for the Bureau to send agent renewal applications to Mayflower and it seemingly relied on the Bureau to thereby notify it of all expiring agent registrations rather than check its own records. This was also negligent on its part. We do not think, however, that, under the circumstances, this further violation can be called willful. In any event, there was no injury to the public interest in view of Levine's continued qualification during the period.

1972 and a check of his file showed no registration beyond 1969, a Bureau investigator went to Mayflower's main office to check its records to ascertain whether Levine had engaged in New Jersey transactions in the interim. (There would have been no violation of New Jersey law if he had not.) Apparently the records were in some disarray by reason of a recent moving of Mayflower's offices. He was shown Levine's commission statements for the entire period which demonstrated that he had executed securities transactions in each of the years in question, but the statements identified the customers served only by number. Whether the customers served were from New Jersey or elsewhere could only be established by examination of the transaction records of the customers whose numbers appeared on the commission statements. Such were produced and examined as to the years 1971 and 1972, which demonstrated a few New Jersey transactions during each of those years. An officer of Mayflower, according to the report of the investigator and his testimony at the hearing, told him that these records for 1969 and 1970 could not be located and probably had been mislaid, lost or destroyed in the course of the office moving.

This proceeding was instituted by the Bureau by service of a proposed order upon Mayflower, together with a notice that the order would become final unless a hearing was requested. Such a procedure is permitted, but not mandated, by the registration suspension and revocation section of the law. *N. J. S. A.* 49:3–58(c)(2).[7] The proposed order here simply recited that "it appearing that" Levine's registration expired on December 31, 1968, that he had been employed by Mayflower from January 1, 1969 through April 1972, that

---

[7] In view of what happened in this case, we suggest the desirability of utilizing instead, at least in cases which might result in suspension or revocation of a registration, a detailed statement of charges so that there may be not the slightest doubt in the mind of the alleged offender or his attorney of what he is charged with and what he must meet in defense of the proceeding.

Mayflower's records showed that he had executed transactions for New Jersey residents in 1971 and 1972 and that Mayflower "could not provide certain records for 1969 and 1970," all in contravention of cited sections of the law and rules. It went on to state, as far as Mayflower was concerned, that its registration as a broker-dealer "be and it is hereby proposed to be revoked." The attorney for Mayflower sought a detailed statement of the record-keeping violation charge, but was furnished only a copy of the investigator's report.

The attorney tells us that he concluded therefrom that the record-keeping charge was not considered to be of substantial import but only incidental to the charge of lack of registration of the agent, that the latter was the real thrust of the proceeding, and, as previously mentioned, that there was no quesion but that Levine did engage in New Jersey transactions during 1969 and 1970 as well as in 1971 and 1972. He also points out that little was made of this aspect of the matter at the hearing, the previously mentioned brief testimony of the investigator being the only reference to the subject. Accordingly, he offered no evidence on the matter at the hearing and was shocked when the Bureau Chief imposed the suspension based at least in part on the absence of the 1969 and 1970 customer records. The attorney thereafter represented to the Appellate Division, and has represented to us, that the missing records were in existence at the time of the investigator's visit and are now in existence and that office personnel had simply not then looked far enough for them.[8]

---

[8]After the Bureau decision and the filing of a notice of appeal, the attorney made a motion to the Appellate Division, pursuant to *R.* 2:5-5(b), to supplement the record by testimony to this effect. The motion was denied. Any such application should ordinarily be made in the first instance to the Bureau as a motion to reopen the hearing, but we are convinced such would have been futile in view of the unduly stringent attitude of the Bureau Chief throughout the hearing.

 While the attorney was mistaken in his assessment of the record-keeping charge, his view and consequent approach were not completely without justification. In any event, the sanction of suspension is so severe a penalty that any such assessment should not be permitted to stand in the way of fair dealing and justice. We therefore are of the opinion that the order of suspension as it relates to this alleged violation should also be set aside for this reason (as well as because of the failure of the final order to find a willful violation and derogation of the public interest) and the matter remanded to the agency for a further hearing to give Mayflower the opportunity to present evidence to substantiate the representations made. If they are satisfactorily established and the records in question submitted, any violation based on failure to produce records on the occasion of the investigator's visit would be of the most technical character— certainly not willful or in derogation of the public interest— and no sanction at all would fairly be called for.[9] Of course, if the supplemental evidence discloses that customers' records were not maintained or that they were maintained but destroyed or lost within the three year period, a more serious situation will be presented.

The order of the Bureau of Securities suspending the registration of Mayflower is vacated and set aside and the matter is remanded to that agency for further proceedings as detailed in this opinion. No costs.

PASHMAN, J. (concurring in part and dissenting in part). I am in agreement with so much of the opinion of the Court that deals with the facts concerning the charge against May-

---

[9] It is to be noted that records for the first four months of 1969 were not, at the time of the investigator's visit, required to be retained under *N. J. S. A.* 49:3–59(b) since they were more than three years old. It would also seem that non-current records less than three years old, possibly kept in storage, should not have to be made available for inspection at the moment of the request.

flower Securities that its agent Alan Robert Levine engaged in New Jersey securities transactions while unregistered. This infraction clearly was not willful nor injurious to the public interest.

The majority has remanded to the Bureau the matter of sanctions. However, it is indicated that said sanction "could validly be a reprimand together with payment of the registration fees" for the several years involved. If the Bureau has implicit authority to impose such a lesser sanction as censure or reprimand, then certainly this Court can do likewise.

As to the record-keeping violation, assuming all the facts as developed by the Bureau, the maximum penalty should also be a reprimand. This probability is envisioned by the majority.

Accordingly, I see no need to continue this matter which has now been in the Bureau and the Court for some time. We have jurisdiction for a final disposition. We can impose a penalty. Both charges call for a reprimand and nothing more.

*For reversal and remandment*—Justices HALL, SULLIVAN and CLIFFORD and Judges CONFORD and COLLESTER—5.

*For reversal*—Justice PASHMAN—1.