854 A.2d 327

IN THE MATTER OF THE PETITION FOR AUTHORIZATION TO CONDUCT A REFERENDUM ON THE WITHDRAWAL OF NORTH HALEDON SCHOOL DISTRICT FROM THE PASSAIC COUNTY MANCHESTER REGIONAL HIGH SCHOOL DISTRICT.

NORTH HALEDON BOARD OF EDUCATION AND BOROUGH OF NORTH HALEDON, PLAINTIFFS–APPELLANTS, v. PASSAIC COUNTY MANCHESTER REGIONAL HIGH SCHOOL DISTRICT, DEFENDANT–RESPONDENT, AND RONNI NOCHIMSON, PASSAIC COUNTY CLERK; WILLIAM LIBRERA, COMMISSIONER OF EDUCATION; AND MARIA NUCCETELLI, PASSAIC COUNTY SUPERINTENDENT OF SCHOOLS, DEFENDANTS.

Argued January 5, 2004—Decided August 11, 2004.

162 

*Vito A. Gagliardi, Jr.,* argued the cause for appellants (*Porzio, Bromberg & Newman,* attorneys; *Mr. Gagliardi* and *Thomas O. Johnston,* on the briefs).

*Rodney T. Hara* argued the cause for respondent Passaic County Manchester Regional High School District Board of Education (*Fogarty & Hara,* attorneys; *Mr. Hara* and *Janet L. Parmelee,* on the briefs).

*Allan P. Dzwilewski* argued the cause for respondents Haledon Board of Education, Borough of Haledon, Prospect Park Board of Education and Borough of Prospect Park (*Schwartz Simon Edelstein Celso & Kessler,* attorneys; *Lenore B. Laracuente,* on the briefs).

*Michelle Lyn Miller,* Senior Deputy Attorney General, argued the cause for respondent Board of Review (*Peter C. Harvey,* Attorney General of New Jersey, attorney; *Nancy Kaplen,* Assistant Attorney General, of counsel; *Ms. Miller* and *Allison Colsey Eck,* Deputy Attorney General, on the briefs).

Chief Justice PORITZ delivered the opinion of the Court.

In this consolidated action, appellants below[1] challenged a decision of a Board of Review, duly constituted pursuant to *N.J.S.A.* 18A:13–56, that authorized a referendum to determine whether the Borough of North Haledon should be allowed to withdraw from the Passaic County Manchester Regional High School District. The crux of their argument was that the Board failed properly to assess the impact of withdrawal on the racial makeup of the student body at the high school operated by the Regional District. The Appellate Division held that a nine percent decrease in the white student population was not a "negligible

---

[1] "Appellants below" refers to two of the three consolidated actions in the Appellate Division (Docket Numbers A–3582–01T5 and A–3597–01T5). They include the Passaic County Manchester Regional High School District, the Borough of Haledon, the Haledon Board of Education, the Borough of Prospect Park, and the Prospect Park Board of Education.

impact" and reversed the Board of Review. *In the Matter of the Petition for Authorization to Conduct a Referendum on the Withdrawal of N. Haledon Sch. Dist. from the Passaic County Manchester Reg'l High Sch. Dist. (North Haledon* II), 363 *N.J.Super.* 130, 139, 831 *A.*2d 555 (2003). We granted certification, 177 *N.J.* 573, 832 *A.*2d 323 (2003), and now affirm and modify the judgment of the Appellate Division.

I

In 1955, the Boroughs of North Haledon, Haledon, and Prospect Park commissioned a study to examine the feasibility of building a limited purpose regional high school. Two years later in 1957, the voters approved formation of the Passaic County Manchester Regional High School District (Regional District) to provide secondary education for students from the three boroughs. As a result, Manchester Regional High School (Manchester Regional) opened its doors in July 1960 on a campus located in Haledon Borough. North Haledon, Haledon, and Prospect Park (collectively, the constituent districts) continued to maintain their own pre-kindergarten through eighth grade school systems.

Tension among the constituent districts has been building for some time. In fact, the impetus for North Haledon's effort to withdraw from the Regional District can be traced to a 1975 amendment to *N.J.S.A.* 18A:13–23, the statute prescribing the method of apportioning regional school district costs among constituent districts. *L.* 1975, *c.* 67, § 29. From 1957 until 1975, the operating costs of the Regional District were apportioned on a per pupil basis. The 1975 amendment, however, required regional districts to apportion all school costs based on the equalized valuation of the property situated in each district, with the consequence that a larger percentage of a regional district's costs was shifted to municipalities with higher property values. In the Regional District, the constituent municipality most affected by that shift was North Haledon. Because North Haledon has a higher property tax base than either Haledon or Prospect Park,

its share of the operating costs increased dramatically and disproportionately compared to the other two districts.

The Legislature amended *N.J.S.A.* 18A:13–23 again in 1993 to allow the operating costs of a regional district to be apportioned on a per pupil basis, equalized valuation basis, or some combination of the two. *L.* 1993, *c.* 67, § 1. In response, North Haledon pursued a referendum that would, if passed, return the Regional District to a per pupil apportionment scheme. Subsequently, on April 18, 1995, a majority of the voters in the Regional District approved a return to the per pupil method; the statute, however, requires approval both by an overall majority district-wide, and "by the voters of *each* municipality." *N.J.S.A.* 18A:13–23 (emphasis added). The question failed to garner majorities in Haledon and Prospect Park and was therefore deemed rejected. Although North Haledon's subsequent challenge to the referendum result was unsuccessful, the litigation revealed that there had been a substantial impact on North Haledon because of the 1975 shift to an equalized valuation scheme. *Borough of N. Haledon v. Bd. of Educ. of Manchester Reg'l High Sch. Dist.* (*North Haledon I*), 305 *N.J.Super.* 19, 24, 701 *A.*2d 925 (App.Div.1997), *certif. denied*, 152 *N.J.* 363, 704 *A.*2d 1298 (1998). By 1994, North Haledon was responsible for over half the district's operating costs, or just over $12,700 per pupil, even though the Borough provided only slightly more than twenty-eight percent of the student body at Manchester Regional. *Id.* at 24 n. 2, 701 *A.*2d 925. By contrast, Haledon and Prospect Park were paying only $5,708 and $3,875 per pupil respectively. *Ibid.*

An ad hoc committee was formed in 1998 by the North Haledon Borough Council to assess what action could be taken to remedy that growing disparity. After examining the possibilities of withdrawing from or dissolving the Regional District, the committee ultimately recommended that North Haledon pursue withdrawal. Because a petition to dissolve a regional district can only be approved when a majority of the constituent districts join in that effort, *N.J.S.A.* 18A:13–51, and because Haledon and Prospect

Park had no interest in dissolution, withdrawal appeared the only feasible remedy.

On the committee's recommendation, the North Haledon Borough Council and North Haledon Board of Education initiated the withdrawal process by passing resolutions requesting Passaic County Superintendent of Schools, Dr. Maria Nuccetelli, to investigate the advisability of the withdrawal of North Haledon from the Regional District. *N.J.S.A.* 18A:13–51 to –52; *see In re Distribution of Liquid Assets Upon Dissolution of the Union County Reg'l High Sch. Dist. No. 1 (Union County* II), 168 *N.J.* 1, 4, 773 *A.*2d 6 (2001) (discussing purpose of superintendent's advisability report). An advisability report is intended to give the constituent municipalities and the local and regional boards "financial, educational and other information . . . to form an intelligent judgment as to the advisability of the proposed withdrawal . . . and the effect thereof upon the educational and financial condition of the withdrawing district and the regional district." *N.J.S.A.* 18A:13–52. Even if the superintendent recommends against withdrawal, the withdrawing district remains free to petition the Commissioner of the Department of Education (Commissioner) pursuant to *N.J.S.A.* 18A:13–54.

Dr. Nuccetelli issued her Investigation and Report (Report) in October 2001. The Report, the contents of which are prescribed by regulation, *N.J.A.C.* 6:3–7.2, analyzed the potential impacts a North Haledon withdrawal would have on Manchester Regional and concluded that the "disadvantages [of withdrawal] would outweigh the advantages for the students remaining in [the Regional District] and for the constituent boards of education and municipalities." Undeterred, North Haledon formally petitioned the Commissioner on November 8, 2001, for permission to submit the issue of withdrawal to the voters. The Regional Board, Haledon, and Prospect Park each filed timely answers in opposition to North Haledon's petition later that month.

Pursuant to *N.J.S.A.* 18A:13–56, the Commissioner submitted North Haledon's petition and the answers to the Board of Review

(Board). The Board consists of four members, the Commissioner, who acts as chairman, a member of the State Board of Education, the State Treasurer, and the Director of the Division of Local Government Services in the Department of Community Affairs, who are authorized by statute to decide whether the question of withdrawal should be put to the voters. *N.J.S.A.* 18A:13–56. Three public hearings were conducted by the Board on North Haledon's petition: at the first, members of the community were invited to submit comments for the record; at the second and third, the Board formally considered the withdrawal issue.

Among other things, and in addition to the public comments, the Board had before it the North Haledon petition, including a detailed feasibility study prepared for North Haledon, the Superintendent's Report and subsequent Addendum,[2] and the answers of the Regional Board, Haledon, and Prospect Park. Together, that data provided a comprehensive educational and financial overview of the Regional District and its constituent municipalities. In light of North Haledon's claims, and the decision of the Appellate Division in this matter, *North Haledon* II, *supra,* 363 *N.J.Super.* at 139–43, 831 *A.2d* 555, we focus here on the information related to the impact of withdrawal on racial and ethnic balance in Manchester Regional and the economic benefits North Haledon anticipates on withdrawal. The parties generally do not dispute the base data that serve as the foundation for both the Superintendent's Report and North Haledon's feasibility study; rather, the disputes, if any, are related to the conclusions reached by those studies.

---

[2] For purposes of her initial investigation, Dr. Nuccetelli assumed an immediate North Haledon withdrawal. However, to reduce the negative impacts of its proposal, North Haledon planned to withdraw over a three-year period. Under that plan, North Haledon students already attending Manchester Regional would be allowed to complete their studies there. The Board requested additional data from Dr. Nuccetelli based on the proposed three year withdrawal period. The data were submitted as a supplement to the advisability report.

In respect of North Haledon's financial burden as a constituent member of the Regional District, viewed on a per pupil basis, the financial data demonstrate that the Borough's costs increased substantially over time. Whereas North Haledon had paid just over $12,700 per pupil before the 1995 special election, by 2001 that figure had risen by $5,700 to $18,400. During that same period, Haledon and Prospect Park per pupil obligations actually decreased from $5,708 to $5,300 and $3,875 to $3,400, respectively. The voters of North Haledon voiced their frustration with their disproportionate burden when they voted in the annual school elections. Thus, in two of the five years preceding the withdrawal petition, North Haledon voters were responsible for the defeat of the Regional District's budget.

The authors of the feasibility study commissioned by North Haledon concluded that the Borough could realize significant cost savings by withdrawing from the Regional District and entering into a sending-receiving relationship with another district. Although at first North Haledon merely identified potential receiving districts, after the withdrawal petition was put before the Board but before the Board completed its review, North Haledon and the Borough of Midland Park (Midland Park) entered into a ten-year sending-receiving agreement. The agreement, which was made contingent on withdrawal, required North Haledon to pay $8,250 per pupil attending high school in Midland Park for the first four years. The Addendum to Dr. Nuccetelli's Report considered the North Haledon–Midland Park sending-receiving agreement in the context of a three-year phase out by North Haledon and concluded that "it would be unclear as to whether there would be a financial advantage for North Haledon during [the phase-out] period." However, that conclusion rested on assumptions that later proved to be incorrect (North Haledon's retention of a Regional District tax share during the phase out), or unlikely (the inclusion of 100 North Haledon high school age students attending private school in the Midland Park tuition calculations).

The data also indicate that the significant increase in North Haledon's per pupil obligations to the Regional District took place at a time when an equally significant change in student demographics at Manchester Regional was taking place. In 1991–1992, the Manchester Regional student body was over eighty-one percent white. By 2001–2002, that figure had dropped to just over fifty-one percent. Further, minority enrollment increased substantially over that same period. For example, in 2001–2002, Hispanics accounted for over thirty-six percent of the student body, up from about thirteen percent in 1991–1992. Black enrollment more than doubled during that same period, from 3.18 percent to 7.59 percent.

The changing face of Manchester Regional was largely attributable to demographic shifts in the constituent districts. When the 1990 and 2000 census data are compared, we see that the racial composition of North Haledon changed little (about ninety-four percent white at the beginning and at the end of the decade). Over the course of the 1990s, however, the white populations of both Haledon and Prospect Park declined noticeably, while the number of Hispanic residents in both municipalities tripled and the number of black residents more than doubled.

As would be expected, that trend was reflected in the kindergarten through eighth grade enrollment data provided by the constituent municipalities. In 1999–2000, the student body at North Haledon's elementary and middle schools was just under ninety-three percent white. By contrast, in the Haledon school system white children made up just over half of the total enrollment and Hispanic children, the largest minority group, made up about thirty-one percent of the enrollment. Prospect Park already had become a minority-majority district, with white students comprising only thirty-five percent of the total population. At over forty-three percent, Hispanic students made up the single largest ethnic group in the Prospect Park school system.

The Report and Addendum concluded that withdrawal by North Haledon would have a negative impact on racial balance at Man-

chester Regional regardless of whether the withdrawal occurred immediately or over a three-year period. More specifically, the Report, using October 2001 data, found that "[t]he withdrawal of North Haledon from [Manchester Regional] will result in a decrease in the school-wide white population by 9% and increases of 1% of African–American students, 7% of Hispanic students and 1% of Asian students." Those findings comport with the findings of North Haledon's experts, who looked first at the racial make-up of the Regional District for the 2000–2001 school year, which was 53.7% white, 6.7% black, 33.6% Hispanic and 6.0% Asian, and then, at racial make-up after North Haledon's students were removed, which was 44.3% white (down 9.4%), 8.3% black (up 1.6%), 40.1% Hispanic (up 6.5%), and 7.3% Asian (up 1.3%). Most telling, both the Superintendent (at 9%) and North Haledon's experts (at 9.4%) found that withdrawal would result in a reduction in white students at Manchester Regional.

When asked by the Board to consider the impact of a phased withdrawal, Dr. Nuccetelli advised that the white student population would decline from fifty-one percent in the year prior to North Haledon's departure (2001), to thirty-eight percent the year after the last students from North Haledon graduated from Manchester Regional (2005), a substantial thirteen percent drop. Her Addendum recognized and commented on the changing demographics in Haledon and Prospect Park, acknowledged that the white student decline was accelerated by that change, and suggested that because "[t]he students that North Haledon could send to Manchester [Regional] would be predominantly white[, they] would assist in maintaining a racial balance in the population."

The Board voted unanimously to grant North Haledon's petition and, on February 8, 2002, ordered the Superintendent to "fix a day and a time for holding a special school election, which shall include the question whether [the withdrawal should take place] over a three-year period." In a subsequent amplification of its earlier decision, the Board explained that withdrawal would nei-

ther create a debt allocation burden nor prevent Haledon and Prospect Park from operating a properly graded school system. Most relevant here, in discussing "[e]fficiency issues," the Board stated: "Although North Haledon will have to enter into a send-receive relationship with another school district, the municipality anticipates a significant cost savings." And, in respect of "[o]ther considerations," the Board concluded:

> Permitting North Haledon to withdraw will have only a negligible impact on the racial composition of the regional school district. Minority populations are increasing in both Haledon and Prospect Park and the white population is decreasing in those areas while there is only a negligible change in North Haledon's population. The withdrawal of North Haledon's students will result in a 9% drop in the white population. However, the change in percent of minorities attending the regional school district would continue to rise, and the white population decline, based upon the change in demographics. Thus, the withdrawal by North Haledon in and of itself does not create a significant change to the racial diversity of the regional school system, rather the regional district will remain a racially diverse district.

Dr. Nuccetelli scheduled the referendum for September 24, 2002, and directed the Regional District to draft the question and interpretive statement. North Haledon, however, objected to the wording of both and sought redress before the Commissioner and in the Law Division. After the Law Division ruled that the Commissioner had jurisdiction to consider the issues raised by North Haledon, the Commissioner revised both· the referendum question and the interpretive statement. When the Regional Board's efforts to secure a stay of the election pending appeal proved unsuccessful, the voters approved North Haledon's petition at a special election. The Commissioner established July 1, 2003, as the effective date of the withdrawal. *North Haledon* II, *supra,* 363 *N.J.Super.* at 137, 831 *A.*2d 555.

The Regional Board, Haledon, and Prospect Park appealed the Board's order permitting North Haledon's petition to go forward, and the Regional Board appealed the Law Division order calling on the Commissioner to exercise jurisdiction to revise the referendum question and interpretive statement. The various appeals subsequently were consolidated. A unanimous panel of the Appellate Division reversed the Board's decision, *North Haledon* II, *supra,* 363 *N.J.Super.* at 144, 831 *A.*2d 555, with the result that

the appeal on the referendum question became moot. *Id.* at 144, 831 A.2d 555.

## II.

The Appellate Division began its analysis by discussing the statutory factors the Board must consider in assessing whether to allow the issue of withdrawal to be put to the voters. 363 *N.J.Super.* at 138, 831 *A.*2d 555. Under *N.J.S.A.* 18A:13–56, a petition for withdrawal from a regional school district may be denied only after the Board has "consider[ed] the effect of the [proposal] upon the educational and financial condition of the withdrawing and the remaining districts," and determined:

1. An excessive debt burden will be imposed upon the remaining districts, or the withdrawing district . . .;

2. An efficient school system cannot be maintained in the remaining districts or the withdrawing district . . . without excessive costs;

3. Insufficient pupils will be left in the remaining districts . . . to maintain a properly graded school system; or

4. Any other reason, which it may deem to be sufficient. . . .

 [*N.J.S.A.* 18A:13–56(b).]

The panel also explained the interplay between the statutory factors and Article VIII, Section 4, paragraph 1 of the New Jersey Constitution: [3]

Facts which establish any of the statutory criteria to refuse permission to withdraw are incompatible with the constitutional guarantee of a thorough and efficient education and dictate denial of the petition.

[Further] the "any other reason" ground must be of the same character as the other three factors, as each factor implicates the State's constitutional obligation for the maintenance of a " 'thorough and efficient system of free public schools.' "

"Any less weighty reason would be an inadequate ground for compelling constituent local school districts and municipalities to preserve a regional school district against the will of a majority of the voters in a majority of its local districts." This court has recognized that racial/ethnic balance within a regional high school district

---

[3] Known as the Education Clause, or the Thorough and Efficient Provision, Article VIII, Section 4, paragraph 1, states:

The Legislature shall provide for the maintenance and support of a thorough and efficient system of free public schools for the instruction of all the children in the State between the ages of five and eighteen years.

is a statutory criteria which must be considered in the evaluation of a petition to dissolve a regional school district.

[*North Haledon* II, *supra,* 363 *N.J.Super.* at 138–39, 831 *A.*2d 555 (citations omitted).]

Having set forth the applicable statutory and constitutional framework, the panel turned to the findings and conclusions of the Board. Judge Cuff accepted the Board's determination "that the withdrawal of North Haledon students will result in a 9% drop in the white [student] population [at the high school, and] that the percentage of minorities will continue to rise and the white population will continue to decline due to population trends in the constituent towns." 363 *N.J.Super.* at 139, 831 *A.*2d 555. However, she rejected the Board's finding that in those circumstances the "9% loss ... would have a negligible impact on the regional high school district," stating:

This finding is out of step with the recognized public policy of this State which seeks to promote equal educational opportunity and to avoid the adverse effects of racial and ethnic imbalance in schools, and which requires education policy makers to anticipate imbalance and to take action to blunt perceived demographic trends which will lead to racial or ethnic imbalance.

[*Id.* at 139, 831 *A.*2d 555.]

Relying on cases from this Court and from the Appellate Division that required the Commissioner and the State Board of Education to exercise their powers to prevent racial imbalance in the schools of this State and "to refrain from actions [that] exacerbate racial imbalance," the panel reversed the Board's decision. *Id.* at 144, 831 *A.*2d 555 (citing *Jenkins v. Township of Morris Sch. Dist.,* 58 *N.J.* 483, 504, 507, 279 *A.*2d 619 (1971); *Booker v. Bd. of Educ. of Plainfield,* 45 *N.J.* 161, 178–79, 212 *A.*2d 1 (1965)); *see also Bd. of Educ. of Englewood Cliffs v. Bd. of Ed. of Englewood (Englewood* I), 257 *N.J.Super.* 413, 459–65, 608 *A.*2d 914 (App.Div.1992) (affirming State Board of Education denial of petition to withdraw from sending/receiving relationship due to substantial negative impact on racial balance), *aff'd,* 132 *N.J.* 327, 625 *A.*2d 483 (1993), *cert. denied,* 510 *U.S.* 991, 114 *S.Ct.* 547, 126 *L.Ed.*2d 449 (1993). The panel distilled from that case law certain principles that it applied to the facts in this case:

First, maintenance of a diverse student population is a critical element in the delivery of a thorough and efficient education. Second, the present racial and ethnic composition of the student body, as well as trends in the student population, are valid factors to be considered by a board of review in considering the effect of the proposed withdrawal and granting or withholding permission to present the issue to the voters. Third, the immediate 9% diminution of the white population and a projected racial and ethnic imbalance in the near future cannot be characterized as insubstantial or negligible.

[*Id.* at 142, 831 *A.*2d 555.]

Reversal of the Board's decision followed from that analysis.

Finally, we especially take note of the Appellate Division's concern about the Board's approach to the petition. The Board concluded that, because of demographic changes, "the decline in the white population in the school is inevitable and the withdrawal of North Haledon students cannot be considered a significant contributing factor in the growth of the minority population in the high school." *Id.* at 143, 831 *A.*2d 555. The panel found that the Board's "attitude of helplessness" conveyed a fundamental misunderstanding of the members' duty to "remediate racial imbalance and, certainly, to refrain from action which will exacerbate racial imbalance." *Ibid.*

## III.

Before this Court, North Haledon argues, among other things, that the Appellate Division improperly applied *Booker, Jenkins,* and *Englewood* I. The Borough asserts that the principles articulated in those decisions are limited to "white flight" contexts (*Englewood* I), or de facto segregation (*Jenkins*), and that the Appellate Division "invent[ed] the concept of 'ethnic imbalance'" to bring this case within the ambit of that case law. Also, North Haledon maintains that the Appellate Division failed to accord the Board's decision the deference owed an administrative agency.[4]

---

[4] North Haledon further asserts that the decision below was flawed, in part, because the court incorrectly stated that Manchester Regional's 2001–2002 student body was fifty-seven percent white. *North Haledon* II, *supra,* 363 *N.J.Super.* at 133, 831 *A.*2d 555. That mistake, subsequently corrected, *id.* at 133

■ We begin our analysis with North Haledon's third contention: that the Appellate Division did not consider the Board's decision under the appropriate standard of review. As the Appellate Division observed in *In re Petition for Authorization to Conduct a Referendum on the Dissolution of Union County Reg'l High Sch. Dist. No. 1* (*Union County* I), generally, decisions of the Board are entitled to broad deference as they constitute "judgments of the administrators whom the Legislature has authorized to make [those] judgments." 298 *N.J.Super.* 1, 9, 688 *A.*2d 1082 (App.Div.), *certif. denied,* 149 *N.J.* 37, 692 *A.*2d 50 (1997). Notwithstanding that broad deference, courts are obliged to undertake a "careful and principled consideration of the agency record and findings." *Mayflower Secs. Co. v. Bureau of Secs.,* 64 *N.J.* 85, 93, 312 *A.*2d 497 (1973). Moreover, in reviewing administrators' decisions, courts are " 'in no way bound by the agency's interpretation of a statute or its determination of a strictly legal issue.' " *Union County* II, *supra,* 168 *N.J.* at 11, 773 *A.*2d 6 (quoting *Mayflower Secs. Co., supra,* 64 *N.J.* at 93, 312 *A.*2d 497). The judiciary may intervene "in those rare circumstances in which an agency action is clearly inconsistent with [the agency's] statutory mission or with other State policy." *George Harms Constr. Co. v. New Jersey Turnpike Auth.,* 137 *N.J.* 8, 27, 644 *A.*2d 76 (1994).

This case is one of those rare instances.

### A.

Long before the United States Supreme Court decision in *Brown v. Board of Education of Topeka,* 347 *U.S.* 483, 74 *S.Ct.*

---

n. 1, 831 *A.*2d 555, is attributable to an inaccuracy contained in the Board's opinion. As noted herein, *supra* at 171, 854 *A.*2d at 332, the correct figure is fifty-one percent. North Haledon argues therefore that, as a matter of simple arithmetic, we must subtract six percent from the nine percent decline in the white student population identified by the Appellate Division to arrive at a three-percent figure. However, fifty-one percent establishes the baseline (a year before withdrawal began). Although technically the "withdrawal point" was designated as the following year (when the reduction indeed would be three percent), in a three year phase-out the white student loss actually would be thirteen percent.

686, 98 *L.Ed.* 873 (1954), New Jersey had rejected segregation in the public schools of this State, by statute and by case law. *See L. 1881, c.* 149 ("[N]o child between the age of five and eighteen years of age shall be excluded from any public school in this state on account of his or her religion, nationality or color."); [5] *Pierce v. Union Dist. Sch. Trs.,* 46 *N.J.L.* 76 (Sup.Ct.1884) (holding that under *L.* 1881, *c.* 149, child of "mulatto" may not be excluded from neighborhood school reserved for white children), *aff'd,* 47 *N.J.L.* 348 (E. & A. 1885); *see also Patterson v. Bd. of Educ. of Trenton,* 11 *N.J. Misc.* 179, 164 *A.* 892 (Sup.Ct.1933) (holding that "colored youth" may not be excluded from swimming classes at Trenton Central High School because of race), *aff'd,* 112 *N.J.L.* 99, 169 *A.* 690 (E. & A.1934). One hundred and fifteen years later, in *In re Grant of Charter School Application of Englewood on the Palisades Charter School (In re Charter Sch. Application),* we reaffirmed "New Jersey's abhorrence of discrimination and segregation in the public schools." 164 *N.J.* 316, 324, 753 *A.*2d 687 (2000). We said, as we had before in *Booker,* that "[w]hether due to an official action, or simply segregation in fact, our public policy applies with equal force against the continuation of segregation in our schools." *Ibid.* (citing *Booker, supra,* 45 *N.J.* at 173–75, 212 *A.*2d 1) (deciding Commissioner must exercise power to address *de facto* segregation in school district). We consistently have held that racial imbalance resulting from *de facto* segregation is inimical to the constitutional guarantee of a thorough and efficient education. *See N.J. Const.* art. VIII, § 4, ¶ 1 (providing for "maintenance and support of . . . free public schools"); *Jenkins, supra,* 58 *N.J.* at 499, 279 *A.*2d 619 (stating that any form of segregation, whether *de facto* or *de jure,* denies " 'educational advantages which are [students'] due' ") (citation omitted); *Booker, supra,* 45 *N.J.* at 171, 212 *A.*2d 1 (recognizing "disadvantages

---

[5] In 1947, the framers of our modern Constitution established that policy as a constitutional right: "No person shall . . . be segregated . . . in the public schools, because of religious principles, race, color, ancestry or national origin." *N.J. Const.* art. I, ¶ 5.

of homogeneous student populations" that result when schools affected by *de facto* segregation); *Morean v. Bd. of Educ. of Montclair*, 42 *N.J.* 237, 242–43, 200 *A.2d* 97 (1964) (pointing out that racial imbalances of fortuitous origin "present much the same disadvantages as are presented by segregated schools"); *Englewood* I, *supra*, 257 *N.J.Super.* at 464–65, 608 *A.2d* 914 (stressing "interrelationship between racial balance and education" evident in state law).

Students attending racially imbalanced schools are denied the benefits that come from learning and associating with students from different backgrounds, races, and cultures. *Jenkins, supra*, 58 *N.J.* at 499, 279 *A.2d* 619; *Booker, supra*, 45 *N.J.* at 170–71, 212 *A.2d* 1. In 1965, Justice Jacobs eloquently described the value derived from "multi-racial and multi-cultural communities" in *Booker*:

> In a society such as ours, it is not enough that the 3 R's are being taught properly for there are other vital considerations. The children must learn to respect and live with one another in multi-racial and multi-cultural communities and the earlier they do so the better. It is during their formative school years that firm foundations may be laid for good citizenship and broad participation in the mainstream of affairs. Recognizing this, leading educators stress the democratic and educational advantages of heterogeneous school populations and point to the disadvantages of homogeneous student populations, particularly when they are composed of a racial minority whose separation generates feelings of inferiority. [45 *N.J.* at 170–71, 212 *A.2d* 1.]

We know that racial balance and education are not "isolated factors," but "different sides of the same coin," *Englewood* I, *supra*, 257 *N.J.Super.* at 464, 608 *A.2d* 914, and that white students relegated to homogeneous schools also are disadvantaged because they too are denied the opportunity for "social and educational development in an atmosphere in which children with differences learn to celebrate and not fear them." *Id.* at 461, 608 *A.2d* 914 (citing *Booker, supra*, 45 *N.J.* at 170–71, 212 *A.2d* 1); *see also Bd. of Educ. of Merchantville v. Bd. of Educ. of Pennsauken*, 93 *N.J.A.R.2d* (EDU) 464, 495–96 (Comm'r of Educ. Sept. 16, 1992) (asserting that "[t]he elimination of racial imbalance is not to be sought as an end in itself but because imbalance stands as a

deterrent and handicap to the improvement of education for all") (citation omitted). When white students are withdrawn from a diverse school environment and placed with a "group of homogenous students," they lose "the educational opportunity to learn to live with and respect people from a variety of racial and ethnic backgrounds by attending school with such individuals." *Bd. of Educ. of Merchantville v. Bd. of Educ. of Pennsauken,* State Board Docket No. 48–92, slip op. at 15 (State Bd. of Educ. Jan. 7, 1998), *available at* http://www.nj.gov/njded/legal.

We have achieved some understanding of the importance of diversity in the forty years since *Morean, supra,* but we have not yet found a way to ensure that "children of all races learn to live with and respect each other in school at an early age." *Englewood* I, 257 *N.J.Super.* at 464, 608 *A.*2d 914. Indeed, as a State, we are losing ground. New Jersey ranks fifth in the nation in the percentage of black students attending ninety to one hundred percent minority schools, and fourth in the nation in respect of hispanic students. Gary Orfield & Chungmei Lee, *Brown at 50: King's Dream or Plessy's Nightmare* 27–28 (2004), *available at* http://www.civilrightsproject.harvard.edu/research/reseg04/brown50.pdf. We are on "[t]he list of most segregated states for black students." *Id.* at 27. We have paid lip service to the idea of diversity in our schools, but in the real world we have not succeeded.

### B.

In reviewing the Board's decision to permit a referendum on North Haledon's petition to withdraw from the Regional District, the Appellate Division relied on the precedents to which we have adverted, and determined that questions of racial imbalance must be a governing consideration any time the Board has a withdrawal petition before it. *North Haledon* II, *supra,* 363 *N.J.Super.* at 143, 831 *A.*2d 555. The regulations controlling withdrawal reinforce that conclusion. *N.J.A.C.* 6:3–7.1 to –7.2. Thus, a petitioning district's request for an investigation by the Superintendent in

respect of the advisability of withdrawal must include "[t]he racial composition of the pupil population enrolled in the regional district from the withdrawing district or municipality, and the effect of such withdrawal upon the racial composition of the remaining pupil population of the regional district." *N.J.A.C.* 6:3–7.1(a)3. The Superintendent's Report is required to address the same issues. *N.J.A.C.* 6:3–7.2(a)3. That requirement serves the important purpose of informing the Board so that it properly can exercise its statutory responsibilities in considering such petitions. *See Union County* I, *supra*, 298 *N.J.Super.* at 7–8, 688 *A.*2d 1082 (stating that Education Clause implies that Board shall comply with constitutional imperatives, including maintaining racial balance, in exercising statutory power).

Further, the powers and responsibilities of the Chairman of the Board *qua* Commissioner are well established. In *Jenkins, supra,* the residents of Morris Township wanted to build a high school of their own and sever a long-standing sending-receiving relationship between Morristown and Morris Township. 58 *N.J.* at 492–93, 279 *A.*2d 619. In 1969, when Morristown initiated the litigation, Morristown was twenty-five percent black and Morris Township was five percent black. *Id.* at 487, 279 *A.*2d 619. It was estimated that the black population in Morristown would increase by the end of the decade to between forty-four to forty-eight percent, and that the black school student population in the town would increase from thirty-nine to sixty-five percent. *Ibid.* In 1969, however, black students made up fourteen percent of the Morristown High School population. *Id.* at 488, 279 *A.*2d 619. That number was expected to double immediately if Morris Township was allowed to withdraw. *Ibid.*

Initially, the Commissioner enjoined Morris Township from proceeding with a bond referendum in connection with construction of the proposed Township high school, *id.* at 492, 279 *A.*2d 619, and urged the Township to "participate in a regionalization study" with Morristown. *Id.* at 493, 279 *A.*2d 619. Yet, despite serious concerns about " 'the growing racial imbalance between

the entire student populations of the Town and Township,' " the Commissioner dissolved the injunction after concluding that he did not possess the authority to prevent withdrawal of Township students or to compel a merger of the two districts. *Ibid.*

We determined that the Commissioner's "flat disavowal of power despite the compelling circumstances," *ibid.*, was inconsistent with the "high responsibilities in the educational field." *Id.* at 504, 279 *A.*2d 619. The Commissioner not only had the power, but also the duty, to act:

> In the course of his decision, the Commissioner recognized that, as a matter of State policy and apart from federal dictates, there is an "obligation to take affirmative steps to eliminate racial imbalance, regardless of its causes." Citing our constitutional provisions for a thorough and efficient school system (art. 8, sec.4, para.1) and against segregation in the schools (art. 1, para.5), he noted: "it may well be that, given the racial disparity between the school populations in Morristown and Morris Township and given the disparity in the socio-economic makeup of the two communities and resultant differences in capacity to provide quality education programs, the Legislature has not fulfilled its constitutional obligation to provide for a thorough and efficient system of public schools." But it seems to us that rather than suggesting an intolerable legislative default, he could and should more reasonably and suitably have found, as we did in *Booker, supra*, 45 *N.J.* at 173–181, 212 *A.*2d 1, faithful legislative fulfillment of the constitutional mandate in the many broad implementing enactments delegating comprehensive powers to the Commissioner.
>
> [*Id.* at 506, 279 *A.*2d 619.]

Among those comprehensive powers was the authority to unilaterally "direct a merger ... if ... such course [is] ultimately necessary for fulfillment of the State's educational and desegregation policies in the public schools." *Id.* at 508, 279 *A.*2d 619; *see In re Charter Sch. Application, supra*, 164 *N.J.* at 329, 753 *A.*2d 687 (stating Commissioner has authority and is required under Education Clause to "assess the racial impact that a charter school applicant will leave on the district of residence in which the charter school will operate").

■ We find that the constitutional imperative to prevent segregation in our public schools applies as well to the Board within the ambit of the exercise of its responsibilities under *N.J.S.A.* 18A:13–56(b)(4), which requires the Board to deny a withdrawal petition for "[a]ny other reason, which it may deem to be sufficient." *Cf.*

*Bd. of Educ. of Englewood Cliffs v. Bd. of Educ. of Englewood,* 170 *N.J.* 323, 339–40, 788 *A.*2d 729 (2002) (affirming State Board of Education's role, with Commissioner, in alleviating racial imbalance). Indeed, the record demonstrates that the Board understood its obligation to maintain racial balance in the Regional District. During the public hearings on the North Haledon petition, the State Board of Education's representative raised the issue repeatedly, at one point, stating: "In view of the recent ruling in *Englewood* by the Supreme Court, they've doubled that effort to have us do what we are told as far as racially balancing schools." Her concern about the potential impact of North Haledon's departure on the racial balance of Manchester Regional led her to comment that she was "not too clear on exactly what kind of diversity would be left if North Haledon would withdraw." That concern was one factor that prompted the Board to request additional information from Dr. Nuccetelli, which she submitted by way of an Addendum to her initial Report.

The demographic trends at work in this case, as in *Jenkins, supra,* "leave little room for doubt as to the unfortunate future if suitable action is not taken in a timely fashion." 58 *N.J.* at 505, 279 *A.*2d 619. Dr. Nuccetelli specifically noted in her Addendum that North Haledon's withdrawal, in combination with the substantial growth of the minority communities in Haledon and Prospect Park, would ultimately cause Manchester Regional to become a "predominantly minority school." We know that the Board fully understood that trend, because it found, in its supplemental opinion, that "[m]inority populations are increasing in both Haledon and Prospect Park and the white population is decreasing in those areas while there is only a negligible change in North Haledon's population." The Board's response, however, is difficult to comprehend—because the shifting demographics in Haledon and Prospect Park made the decline in the percentage of white students at Manchester Regional inevitable, the Board, in effect, decided that North Haledon's withdrawal did not really matter.

 Not every action that reduces the percentage of white students necessarily implicates the State's policy against segregation in the public schools. We observed in *Booker, supra,* that it is not really possible to establish a precise point when a thorough and efficient education is threatened by racial imbalance. 45 *N.J.* at 180, 212 *A.*2d 1. What we do know is that in this case, demographic trends are contributing to a steady decrease in the number of white students attending Manchester Regional, and that North Haledon's withdrawal will accelerate this trend. Rather than use the demographic trend as an excuse for approving North Haledon's petition, the Board should have considered the ameliorative effect of denying the petition on the racial balance at Manchester Regional. *See North Haledon* II, *supra,* 363 *N.J.Super.* at 139, 831 *A.*2d 555 (discussing Supreme Court decisions requiring "education policy makers to anticipate imbalance and to take action to blunt perceived demographic trends which will lead to racial or ethnic imbalance") (citations omitted). As of the 2001–2002 school year, 125 of North Haledon's 135 students at Manchester Regional, over ninety-two percent, were white. Their contribution to the rich diversity of the high school was invaluable.

The Board also failed to consider the "multi-racial and multi-cultural" opportunities lost to the students from North Haledon should the Borough succeed in its petition. Midland Park, the proposed receiving district for North Haledon's students, is overwhelmingly white.[6] The United States Supreme Court recently discussed, albeit in a different context, the advantages of attending school with students of different races and from different cultures. *Grutter v. Bollinger,* 539 *U.S.* 306, 330–31, 123 *S.Ct.* 2325, 2339–40, 156 *L.Ed.*2d 304, 333–34, *reh'g denied,* 539 *U.S.* 982, 124 *S.Ct.* 35, 156 *L.Ed.*2d 694 (2003). Writing for the Court, Justice O'Connor found the benefits of diversity to be "substantial" in that they "promote[ ] 'cross-racial understanding,' help[ ] to break down

---

[6] According to enrollment figures provided by Haledon and Prospect Park, in the 1999–2000 school year, the student body of Midland Park was almost ninety-three percent white.

racial stereotypes, and 'enable[ ] students to better understand persons of different races.' " *Id.* at 330, 123 *S.Ct.* at 2340, 156 *L.Ed.*2d at 333 (citation omitted). At the public hearing held by the Board in connection with North Haledon's petition, Nicole Rizzi, a North Haledon resident and Manchester Regional graduate, gave concrete expression to Justice O'Connor's observations:

> After my first semester in college, I fully appreciated not only the solid academic foundation I built at Manchester but also, more importantly perhaps, the well-rounded person I had become as a result of my time there. Teachers challenged me to explore not only the things I liked to do, but also the things I didn't, or hadn't given much thought to. And of my friends and fellow students at Manchester, well, let's just say there was never a shortage of opinions or different viewpoints. Many friends I've made in college expressed regret that their high school had been very exclusive or homogenous, and that has helped me see how important my experiences at Manchester were. Manchester didn't just prepare me for the university; it prepared me for the real world, where people of different cultures, socio-economic backgrounds and family structures need to work cooperatively. I feel my time spent there was invaluable, and I continue to support the students and the community. It would be regrettable that students from North Haledon would be deprived of the opportunity to attend classes and participate in activities with students of different cultures, socio-economic backgrounds and family structures like I did.

We find that, in this case, withdrawal by North Haledon will deny the benefits of the educational opportunity offered by a diverse student body to both the students remaining at Manchester Regional and to the students from North Haledon. We conclude that the Board's decision permitting a referendum on the question of withdrawal is not sustainable as a matter of law, and affirm the decision of the Appellate Division reversing that decision.

## IV.

North Haledon's efforts to withdraw from the Regional District followed an unsuccessful attempt to convince Haledon and Prospect Park to change the method of apportionment for the operating costs of Manchester Regional. There is no suggestion in the record that North Haledon was racially motivated in petitioning for withdrawal; rather, North Haledon was justifiably concerned about the disproportional tax burden (over $2.5 million in the

2001–2002 school year) carried by its citizens in relation to the other constituent municipalities. We are not unaware of the frustration and anger expressed by the senior citizens of North Haledon who have fixed incomes and escalating property taxes. On the one hand, North Haledon lost a referendum on the question whether to alter the apportionment scheme because the statute, *N.J.S.A.* 18A:13–23, grants an effective veto power to Haledon and Prospect Park who benefit from the equalized valuation method North Haledon seeks to change. On the other hand, North Haledon cannot petition for withdrawal because of the impact of withdrawal on the racial balance of the students attending Manchester Regional.

We confronted a similar issue subsequent to our decision in *Jenkins, supra.* After *Jenkins* issued, the Commissioner compelled the merger of the Morristown and Morris Township school systems. *Township Comm. of the Township of Morris v. Bd. of Educ. of the Township of Morris,* 60 *N.J.* 186, 188, 287 *A.*2d 449 (1972). The boards of education from both towns recommended that the "allocation of costs between the component municipalities of the regional district be on the basis of apportionment valuations rather than pupil enrollment." *Id.* at 188–89, 287 *A.*2d 449. The Commissioner agreed, and ordered the new regional district to apportion costs in the manner suggested by the school boards. *Id.* at 189, 287 *A.*2d 449. The Township Committee of Morris Township filed suit, asserting the Commissioner lacked the power to impose an apportionment scheme on the new district. *Id.* at 189–90, 287 *A.*2d 449. The Township Committee argued that, under *N.J.S.A.* 18A:13–34, the power to set the apportionment scheme had been conferred on the voters of a regional district. *Id.* at 190, 287 *A.*2d 449.

We rejected the Township's argument because "[t]he Commissioner's determination as to allocation of the costs was reasonable and was well within the ambit of his powers." *Id.* at 191, 287 *A.*2d 449. We reasoned that the controlling statutory provision, *N.J.S.A.* 18A:13–34 (which calls for a special election on the

apportionment of costs for a regional district), was not applicable in the context of a compulsory merger ordered by the Commissioner, and that requiring voter approval would "disable effective action toward fulfillment of the State's educational and desegregation policies ... nullify[ing] the very holding in *Jenkins*." *Ibid.*; *cf. N.J.S.A.* 18A:7F-6 (authorizing Commissioner to compel school districts to make additional expenditures even after school budgets have been approved by voters when "necessary to ensure implementation of [thorough and efficient] standards"). In this case also, the constitutional imperative to address racial segregation requires the Board to compel North Haledon to remain in the Regional District despite the tax burden on its citizens. As in *Jenkins,* when a constituent municipality is compelled to participate in a Regional District, *N.J.S.A.* 18A:13–23 is not applicable and the Commissioner may determine cost allocations among and between Haledon, Prospect Park, and North Haledon.

We therefore remand this matter to the Commissioner to develop, in consultation with the constituent municipalities, an equitable cost apportionment scheme for the Regional District.

## V.

The judgment of the Appellate Division is affirmed, as modified. The matter is remanded to the Commissioner for further proceedings consistent with this opinion.

*For affirmance as modified/remandment*—Chief Justice, PORITZ and Justices VERNIERO, LaVECCHIA, ZAZZALI, ALBIN and WALLACE—6.

*Opposed*—None.